# WEISS ET AL. *v.* UNITED STATES.

No. 42.   Argued November 13, 14, 1939.—Decided December 11, 1939.

*Mr. Theodore Kiendl* for Dr. Maximilian Goldstein; *Mr. Lloyd Paul Stryker* for Joseph J. Weiss; and *Mr. Jacob W. Friedman* for Martin Gross,—petitioners.

*Assistant Attorney General Rogge,* with whom *Solicitor General Jackson* and *Messrs. Benjamin M. Parker, George F. Kneip, Louis B. Schwartz, Fred E. Strine,* and *W. Marvin Smith* were on the brief, for the United States.

Mr. Justice Roberts delivered the opinion of the Court.

The petitioners were indicted, with five others, in the District Court for the Southern District of New York for using the mails to defraud and for conspiracy so to use them.[1] The alleged scheme was to cheat insurance companies by inducing them to pay false claims for disability, health, and accident benefits to three of the defendants, Nelson, Berger, and Spitz. These three pleaded guilty and testified for the Government. Three defendants who were physicians,—Messman, Goldstein, and Krupp—were alleged to have assisted by furnishing policy holders false medical certificates and instructing them how to simulate illness. Messman pleaded guilty and testified for the Government. The other two stood trial. Two lawyers, Joseph J. Weiss and Alfred L. Weiss, and an investigator, Gross, were charged with having furthered the claims knowing them to be false. Alfred L. Weiss was granted a severance; Joseph J. Weiss and Gross stood trial. Each of the petitioners was convicted and sentenced. The judgments were affirmed by the Circuit Court of Appeals.[2]

The conspiracy and scheme charged covered a period extending from January 15, 1934, to July 30, 1937, the date of the indictment. The principal issue of fact was whether the petitioners participated in making false claims with guilty knowledge. Over objection and ex-

[1] Under U. S. C. Tit. 18, §§ 338 and 88.
[2] 103 F. 2d 348.

ception, the trial judge admitted evidence of seventy-six intercepted telephone communications.

For months prior to the finding of the indictment telephone messages over the wires leading into the offices of Weiss and Messman in New York City, were intercepted. The wires were tapped by a policeman acting under instructions of a United States Post Office Inspector. The intercepted messages were taken stenographically and were also simultaneously recorded on phonograph discs by employes of a detective agency acting under the same instructions. Each night the records and stenographic transcripts of communications intercepted during the day were delivered to the United States Attorney or his representative. Interstate calls were made from Weiss' office and the tapped wires were the conduits of both interstate and intrastate communications. Every call, whether interstate or intrastate, to or from Weiss' office, was intercepted and recorded.

It appeared at the trial that one of the defendants who pleaded guilty had been confronted with the phonographic records and had then decided to plead guilty and become a witness for the Government. Others who had been informed of the Government's possession of the records did likewise. In the preparation for trial one of the defendants, who was to testify for the prosecution, held a typed copy of the stenographic transcript of a telephone conversation in which he had participated while a phonographic record of the conversation was played to him. He corrected the typed manuscript to make it conform to the words emitted from the phonograph. He then marked the phonographic record and the script for identification.

The Government's procedure at the trial in proving the communications was to call as a witness one of the defendants who had pleaded guilty, and to hand him a transcript

he had marked for identification. After he had testified that, on a given date, he held a telephone conversation with one of the other defendants, he was asked whether he could repeat the conversation verbatim. Upon his stating that he could not do so without the use of the typed transcript he was permitted to read it to the jury. Subsequently the Government offered the identified phonograph records and typewritten transcripts in evidence and they were admitted. Certain of the records were played to the jury while each juryman held a copy of the typewritten transcript of the conversation. All of the communications in question are conceded to have been intrastate save one which, however, was not shown to have been interstate.

The petitioners' objections to the admission of this evidence were that it would violate § 605 of the Federal Communications Act of 1934;[3] would violate the Fourth and Fifth Amendments of the Federal Constitution, and would be in the teeth of § 1423, subdivision 6, of the Penal Law of the State of New York,[4] making wire tapping a crime.

Because of conflict of decision in the Circuit Courts of Appeal[5] we granted certiorari, limited to the "question whether the trial court properly received in evidence intercepted telephone communications."[6]

In *Nardone* v. *United States,* 302 U. S. 379, it was decided that § 605 of the Federal Communications Act prohibited the reception in a federal court of evidence of interstate communications obtained by federal agents by tapping telephone wires. The petitioners assert, and the

---

[3] c. 652, 48 Stat. 1064, 1103; U. S. C. Tit. 47, § 605.

[4] Thompson's Laws of New York, 1939, Part I, p. 1909.

[5] *Valli* v. *United States,* 94 F. 2d 687; *Diamond* v. *United States,* 94 F. 2d 1012, and unreported opinion on petition for rehearing; *Sablowsky* v. *United States,* 101 F. 2d 183.

[6] 307 U. S. 621.

respondent denies, that the section bars evidence of intra-state communications similarly obtained. The Government further claims that, even if the section would otherwise bar the evidence, it does not have that effect in this case, because interception and divulgence of the messages put in evidence were "authorized by the sender" within the meaning of the section.

The section consists of four clauses separated by semicolons. The pertinent one is the second: "and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person;". Plainly the interdiction thus pronounced is not limited to interstate and foreign communications. And, as Congress has power, when necessary for the protection of interstate commerce, to regulate intrastate transactions,[7] there is no constitutional requirement that the scope of the statute be limited so as to exclude intrastate communications.

The petitioners and the Government alike refer to the context of the critical clause, and the legislative history of the Communications Act, the former to demonstrate that all communications are protected from interception and divulgence, the latter to prove that the language of the Act must be more narrowly interpreted to cover only interstate and foreign communications.

In support of the petitioners' view it is pointed out that each clause of § 605 is complete in itself; that in the first and third clauses, which deal with divulgence of messages by persons engaged in receiving or transmitting them, the communications are specified as "any interstate or foreign communication," whereas, in the second and fourth

---

[7] *Shreveport Case*, 234 U. S. 342, 351, 352; *United States* v. *Louisiana*, 290 U. S. 70, 75; *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 38.

clauses, which deal with interception and divulgence of communications, the phrases used are "any communication" and "such intercepted communication." It is argued that the difference in phraseology must have significance; and, in support of the assertion that the variety of expression was not due to inadvertence, the petitioners call attention to the fact that § 605 was taken over from § 27 of the Radio Act of 1927,[8] which, referring to radio messages, used uniformly, in each clause, the term "communication" or "message" and nowhere qualified the designation by the use of the phrase "in interstate or foreign commerce."

The petitioners further urge that there is good reason for the distinction in the phrasing of the clauses in § 605 since persons employed by communication companies can distinguish between interstate and intrastate messages which they handle, whereas, inasmuch as messages of both sorts pass indiscriminately over the same wires, the intercepter cannot make a similar distinction and the only practicable way to protect interstate messages from interception and divulgence is to prohibit the interception of all messages.

The Government argues that a reading of the whole section makes it plain that to give the second clause the scope contended for by the petitioners will lead to incongruities and inconsistencies in the operation of the section. We find none such as are sufficient to countervail what appears to be the plain meaning of the second clause.

The Government correctly asserts that the main purpose of the Communications Act of 1934 was to extend the jurisdiction of the existing Radio Commission to embrace telegraph and telephone communications as well as those by radio. We are asked to hold that if Congress

---

[8] Act of Feb. 23, 1927, 44 Stat. 1162, 1172.

had intended to make so drastic a change as to regulate intrastate as well as interstate communication, both the legislative history of the Act and its phraseology would so indicate, whereas there is nothing in either to emphasize any such extension of authority. We think, however, that the legislative history does not serve to explain the difference in the wording of the various clauses of § 605. In making the alterations in the phraseology of the similar section of the earlier act the Congress must have had some purpose. We cannot conclude that the change in the wording of two of the four clauses of the section was inadvertent.

The Government further contends that the Act, viewed as a whole, indicates an intent to regulate only interstate and foreign communication. The title and §§ 1 and 2, with a single exception which serves to emphasize the distinction, expressly so declare. But we think these considerations are not controlling in the construction of § 605. The Commission's regulatory powers and administrative functions have to do only with interstate and foreign communications. But § 605 delegates no function and confers no power upon the Commission. It consists of prohibitions, sanctions for violation of which are found in § 501.[9] We hold that the broad and inclusive language of the second clause of the section is not to be limited by construction so as to exclude intrastate communications from the protection against interception and divulgence.

We come, then, to the Government's second proposition,—that disclosure of the intercepted communications was "authorized by the sender" within the meaning of the clause. It is true that one or both of the parties to each of the admitted communications attested in the manner we have indicated to the intercepted conversations. This

---

[9] 48 Stat. 1100, 47 U. S. C. § 501.

is said to amount to a consent to the divulgence of the subject matter and to satisfy the statute in that respect. We think the position is untenable. The Act contemplates voluntary consent and not enforced agreement to publication. The participants were ignorant of the interception of the messages and did not consent thereto. The contents of the stenographic transcripts and phonographic records were, prior to the trial, made available to Government agents and United States attorneys. This divulgence was not consented to by either of the parties to any of the telephone conversations. In the absence of such divulgence the Government would have been without the evidence embodied in the messages.

It is said, however, that, when some of the defendants pleaded guilty, elected to take the stand and to testify to the contents of the messages, they gave the authorization contemplated by the statute. We have already adverted to the method by which this supposed authorization was obtained. Certain of the defendants who were participants in the telephone conversations were informed of the Government's possession of the contents of their communications. Under the stress of this situation they determined to turn state's evidence. Messman's license to practice medicine has not been revoked; he was not required to plead to the indictment; he was paid a salary by the Government, first of $65.00 per week and later of $100.00 per week, amounting, in the total, to $3,237.12. Nelson's sentence was suspended. He was paid a salary of $50.00 per week. Berger's sentence was suspended. Spitz's sentence was suspended.

Statement of these facts is convincing that the so-called authorization consisting of the agreement to turn state's evidence, by some of the defendants after they had been apprized of the knowledge of their communications by the Government's representatives, and in the hope of leniency, was not that intended or described by the stat-

ute and emphasis the offensive use which may be made of intercepted messages, whether interstate or intrastate. It is not too much to assume the interdiction of the statute was intended to prevent such a method of procuring testimony.

We hold that § 605 rendered the communications inadmissible, and that it was prejudicial error for the trial court to admit them either by permitting the defendants who turned state's evidence to read the transcripts or allowing the prosecutor to put the transcripts and phonographic records into evidence upon identification by the parties to the conversations.

We have no occasion to consider or decide the questions raised by the other objections of the petitioners to the admission of the evidence.

The judgments are reversed and the cause is remanded to the District Court for further proceedings in conformity with this opinion.

*Reversed.*