### UNITED STATES v. COPLON et al.

United States District Court
S. D. New York.
Jan. 20, 1950.

See also 88 F.Supp. 915.

923

Irving H. Saypol, U. S. Attorney, New York City, attorney for plaintiff, John M. Kelley, Jr., Raymond P. Whearty and Fred E. Strine, Special Assistants to the Attorney General, of counsel.

924

Archibald Palmer, New York City, attorney for defendant Coplon.

Pomerantz, Levy, Schreiber & Haudek, New York City, attorneys for defendant Gubitchev, Abraham L. Pomerantz, New York City, of counsel.

RYAN, District Judge.

Defendants move before trial on the indictment to which they have pleaded not guilty for an order,

(1) suppressing all records, transcripts, and notes for any kind made of intercepted telephonic communications of defendants;

(2) suppressing all evidence obtained as a result or use of such intercepted communications;

(3) directing the government to turn over to them all records, recordings, transcripts and notes of such communications;

(4) suppressing all notes, information or memoranda obtained as a result of intercepting mail addressed to or mailed by the defendants, and all evidence obtained as a result thereof;

(5) dismissing the indictment upon the ground that it is found on evidence illegally obtained, directly or indirectly.

Defendant Gubitchev seeks in addition an order,

(1) directing the government to turn over to him all notes, information and memoranda of intercepted mails addressed to or posted by him;

(2) suppressing all records, transcripts and notes of any kind made by dictaphone recordings of the voice of defendant, or any dictaphone recordings made from his home or place of work, and suppressing all evidence obtained as a result or by use of such recordings;

(3) directing the government to turn over to him such recordings, transcripts, notes and memoranda thereof.

It has been necessary on these motions to hold extended hearings and to receive oral and documentary evidence as to the nature, extent and duration of unlawful interceptions, their substance and content and to ascertain what evidence was obtained as a result of them. The government has also been afforded full and ample opportunity to establish that a substantial portion of its case against defendants has independent origin.

Nature, Extent and Duration of Interceptions:

It is not disputed by the government that four separate telephone circuits were intercepted, that the interceptions were installed prior to the return of the indictment on March 10, 1949, and that they were continued for a long time thereafter and up to the eve of these hearings.

It has been established that a microphone installation was effected in the office used by defendant Coplon—Room 2220, Department of Justice Building, Washington, D. C. It was testified that this was installed on her desk. I find that telephone wires were used in connection with the transmission of the sounds picked up by the microphone to the agent who simultaneously monitored the interceptions of the telephone and the microphone eavesdropping amplifications. I am mindful of the fact that the Supreme Court has held that listening to conversation by means of a detectaphone constitutes eavesdropping only and not an unlawful interception. I rule that under the present circumstances, the holding of the Court in Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, affirming United States v. Goldman, 2 Cir., 1941, 118 F.2d 310 is not applicable and that the auditions picked up by this microphone are interceptions. I have arrived at this conclusion because of the failure of the government to disclose how the microphone was installed and in what way it differed, if at all, from a wiretap. I consider all information secured by means of this microphone in the same class as that secured by telephone interception.

Telephone Interceptions:

I find that the following taps were installed and maintained by agents and employees of the Federal Bureau of Investigation:

(a) Coplon residence—3685 38th St., N.W. Washington, D. C. (referred to as the McLean Garden apartments), telephone No. Woodley 5219, installed January 6,

1949 continuously maintained until March 19, 1949;

(b) Coplon office—Room 2220, Department of Justice Building, Washington, D. C., telephone No. Republic 8200, ext. 163, installed January 25, 1949 continuously maintained until March 12, 1949;

(c) Coplon family residence—178 Ocean Parkway, Brooklyn, N.Y.C., telephone Nos. Gedney 8-1048 and Ulster 3-6417, installed February 1, 1949 maintained until May 2, 1949, re-installed on July 12, 1949 and continuously maintained until November 10, 1949;

(d) Gubitchev residence—64 W. 108th St., N.Y.C., telephone No. Academy 2-5823, installed February 1, 1949 continuously maintained until September 27, 1949.

I further find that the microphone was installed in the Coplon office on January 25, 1949 and continuously maintained until March 12, 1949, and that in connection with this microphone the telephone lines of the office telephone of this defendant were used to transmit the sounds within range of the microphone.

The alleged authorization of the Attorney General:

 It is stated that these taps were installed "pursuant to written authorization in each instance received from the Attorney General of the United States." Such authorization did not clothe with legality the unlawful activities of the wire tappers nor detract at all from the interdiction of the Supreme Court on evidence secured by this type of investigation.

Congress, in 1934 when it passed the Communications Act, 48 Stat. 1064, 47 U.S. C.A. § 151 et seq., providing for the regulation of the radio, telegraph and telephone industries, included in the act a concise and all-inclusive section, Sec. 605, prohibiting wiretapping. It not only forbade such interception but rendered its contents inadmissible as evidence and made such interception and the use or divulgence of information so obtained a felony punishable by imprisonment or fine, or both. This is still the law; it has not been repealed or modified, it contains no exemptions as to any individual and no exception as to inves-

tigation of any particular type of crime, irrespective of how heinous or dangerous to national safety and security. It is not within my province to question the wisdom of so sweeping a prohibition or to enter upon a consideration and examination of its reasons, or the philosophy prompting this unmistakable condemnation.

The fact that these interceptions were carried on under written authorization of the Attorney General imparts no sanctity to them: they remain unlawful and prohibited.

Operations under Interceptions:

The coverage on all the interceptions was 24 hours a day; the interceptions were monitored by agents listening in with earphones. Thirty different agents at various times monitored the New York interceptions; all have submitted affidavits and statements of their recollection of the messages they picked up and have testified and been examined by defendants. Four agents functioned intermittently as monitors on the Coplon office microphone and telephone tap (referred to by them as a "combination tap"); sixteen at various times operated as monitors on the Coplon Washington residence interceptions. Many of them testified and the results of their monitoring are in evidence. They kept, in their own handwriting, a log in which they noted the time of the intercepted messages, the identity of the participants to the conversations whenever possible, and a brief resume of what they heard. A recording apparatus was interposed on the telephone circuit of all the intercepted lines. This was under the control of the monitor who was then able to and did select and record on discs the interceptions he deemed important and so much of them as he wished.

Records of the Interceptions:

In Washington, the monitors kept detailed, handwritten logs which have been produced and subjected to defendants' inspection. From these and from phonographic records more detailed typewritten logs were compiled, to which also defendants have been given access. The disc recordings of both telephone and microphone interceptions have been introduced

in evidence and made available to defendants. Many of these have been played at the latter's request under the supervision of the court; experts have been permitted to examine the discs and hear played those selected by them. Access to the subject matter of these interceptions has been denied the press and the public; this, because of the prohibition against divulgence of Section 605; only such disclosure has been permitted as was felt to be absolutely necessary and unavoidable in the administration of justice. I find that all the information obtained as a result of the Washington interceptions has been produced and that the original recordings have been preserved intact, in no way mutilated or defaced.

In New York also the monitors kept handwritten logs and, in addition daily resumes of their interceptions. Most of these writings have been destroyed and so could not be produced, but such as were available at the time of the hearings were marked in evidence and inspected by defendants. Reports and digests of the interceptions were prepared weekly the originals of which were destroyed prior to the hearings but copies of some were produced and opened to defendants. None of the original New York discs and recordings are in existence, having all been destroyed. I find that it was the practice of the New York office of the Federal Bureau of Investigation to regularly destroy each month such recordings as were 30 to 60 days old and which had not been specifically marked for preservation. This accounts for the absence of the majority of these recordings. However, it appears that on November 7, 1949 an order was issued by the Bureau for the destruction of all remaining discs and written records of the New York interceptions, following which on November 10 some remaining ten discs and writings were destroyed. The reason assigned for this was national security, and whether the action was judicious in view of the pending indictment, I need not determine. I do find, however, that the destruction was neither contemptuous nor intended to interfere with the administration of justice. I find, too, that as a result of searches instituted

at the order of the court sufficient evidence has been made available to establish all the material and relevant matters disclosed by these interceptions.

Substance of the Interceptions:

Careful study of the information obtained on all these interceptions reveals that at no time was a conversation between defendants Coplon and Gubitchev intercepted; that at no time was either defendant heard mention the name of the other; that the existence of the alleged conspiracy was never discussed in the slightest manner. None of the interceptions on the Gubitchev tap disclosed evidence of the alleged conspiracy; they revealed but personal matters in no way relevant or material to the issue and the same is true of the greater part of the Coplon interceptions. Conversations between this defendant and her attorney were intercepted on defendant's wire, but it is apparent that at such times they were suspicious that the circuit was being tapped and consequently they refrained from discussing matters of any importance. (At least as early as March 16, 1949, the attorney was heard on the telephone express his suspicions of this.)

Analysis of the results of the many, many days of monitoring these interceptions discloses that only two matters of importance or relevance to the investigation were ascertained, to wit, information as to the precise time and day on which defendant Coplon planned to journey from Washington to New York during the period of the alleged conspiracy and information concerning her contacts and relationship to one H.S. a male acquaintance. In this manner, the Bureau's agents did obtain advance information of defendant's trips to New York City on January 14, 1949, January 19, 1949, February 18, 1949 and March 4, 1949. (On three of these days—January 14, February 18, and March 4, it is charged by the government, defendants met, in New York City, in furtherance of the conspiracy in which it is alleged they were engaged.) From this source, also, the agents obtained advance knowledge of an alleged visit by defendant Coplon and H.S. to Baltimore, Md.

■ The law applicable to the admissibility of evidence secured by means of the interception of telephone communications has been established. Wire tapping is not a search and seizure in contravention of the Fourth Amendment to the Constitution. Olmstead v. United States, 277 U.S. 438; 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376, and evidence secured by this means is inadmissible in the federal courts solely by reason of Section 605 of the Federal Communications Act, supra. The Supreme Court has ruled that testimony as to what was heard over the intercepted line is not admissible in evidence, nor are the transcripts and recordings of the intercepted messages. Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314. The prosecution is prohibited from introducing not only direct evidence of the information so secured, but also evidence indirectly traceable to the interception. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. The Supreme Court further clarified the doctrine of the first Nardone case by ruling that records or transcripts of the intercepted messages and testimony as to their contents, cannot be introduced in evidence without the voluntary authorization of the participants; this authorization cannot be compelled or forced by reason of the fact that the contents are known to the government. United States v. Weiss, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298. If, however, the prosecuting officers use records or transcripts of intercepted messages to induce the parties to them to testify for the prosecution, the testimony so procured is not rendered inadmissible against a person not a party to the message. Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312. That is, if the defendant was not party to the intercepted conversation, he may not be heard to object to their use as evidence. United States v. Seeman, 2 Cir., 115 F.2d 371. In this circuit, the Court of Appeals has ruled that the authorization of the participants necessary to make evidence of the intercepted messages admissible, must be by both participants, not by one only. United States v. Polakoff, 2 Cir., 112 F.2d 888, 134 A.L.R. 607.

In the second Nardone case, supra, the Court outlined the practice which should be followed in conducting a pre-trial hearing on illegal wire-tapping, stating 308 U.S. at page 341, 60 S.Ct. at page 268,

"A sensible way of dealing with such a situation—fair to the intendment of § 605, but fair also the purposes of the criminal law—ought to be within the reach of experienced trial judges. The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin."

■ I have on the hearings of these motions allowed defendants considerable latitude—far more than would have been justified in the ordinary proceeding of this type. I have done this because of the extent of the wire-tapping and because complete original records were not available. This has resulted in what I deem a full and complete disclosure to the defendants of all conversations, information and evidence secured by the government as a result of these interceptions. The Court of Appeals for this circuit has interpreted the language of the Nardone case, above-quoted, holding that "once the defendant made out a *prima facie* case showing tapping had been used to some extent and the evidence it had produced, the final burden rested on the government to refute this charge." Cornell L. O. Vol. 32, p. 539, June, 1947; United States v. Goldstein, 2 Cir., 1941, 120 F.2d 485. The Supreme Court, affirming this decision, Goldstein v. United States, supra, found it unnecessary to determine which party, under the circumstances, had the burden of proof. I have ruled, following the Court of Appeals that the burden is on the government to establish that the evidence it intends to offer to substantiate the charges in the indictment springs from independent sources,

untainted by and not traceable to the unlawful interceptions.

Although the interception of telephone communications does not constitute an unconstitutional search and seizure, the same policy is to be applied in ruling on the admissibility of evidence procured by either means. Goldstein v. United States, supra, 316 U.S. at page 120, 62 S.Ct. 1000. It is settled that facts improperly obtained do not thereby become "sacred and inaccessible." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 183, 64 L.Ed. 319, 24 A.L.R. 1426. If knowledge of them can be obtained from independent sources, they may be proved like any other facts. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. The rule has been stated that "unless it can be said that the incidents themselves could not be shown at all in the absence of the telephone conversations, it would seem that the government should not be forbidden to present its case." United States v. Weiss, D.C.S.D.N.Y., 1940, 34 F.Supp. 99, 102.

The Indictment:

The indictment contains four counts. The first charges that the defendants "on or about January 1, 1949 and for some time prior thereto, the exact time being unknown to the Grand Jury, and continuously thereafter up to and including the date of the filing of the indictment" on March 10, 1949, conspired to violate the provisions of Sections 793, 794 and 2071, 18 U.S.C.A. Three overt acts are alleged in this count and it is charged that on three different days—January 14, February 18 and March 4, 1949, the defendants met and conferred within this district. The second count charges that the defendant Coplon on March 4, 1949 in this district "did wilfully attempt to communicate and transmit" to Gubitchev documents affecting national defense, in violation of Section 793, 18 U.S. C.A. The third count charges that Gubitchev on the same day did unlawfully attempt to obtain and receive from Coplon documents relating to national defense, in violation of Section 793, 18 U.S.C.A. The fourth count charges that "Coplon, with intent and reason to believe that they would be used to the injury of the United States and to the advantage of a foreign nation, did attempt to communicate, deliver and transmit to * * * Gubitchev a citizen and subject of the Union of Soviet Socialist Republics" documents relating to the national defense in violation of Section 794, 18 U.S.C.A.

The Independent Proof of the Government:

The government to establish the truth of the allegations of the indictment represents and states, in substance, that the proof it intends to present on the trial will come within one or another of the following:

(a) testimony of agents with respect to what they observed of the activities of defendants during three meetings in New York City (Jan. 14, Feb. 18, March 4);

(b) evidence of William E. Foley and others concerning conversations and transactions with defendant Coplon;

(c) proof of preparation and delivery to defendant Coplon of a decoy memorandum;

(d) testimony relating to documents found in defendant's purse at the time of her arrest consisting of official Department of Justice records relating to the national defense.

Testimony of several agents of the Federal Bureau of Investigation established that the first information received which set them on the trail of the defendants came from a "confidential informant." Counsel attempted to show that the confidential informant was a wire-tapper. The court sustained objections to all questions which sought the identity or character of the informant. This was done to prevent unnecessary probe into the confidential sources of information of the Bureau and since it has been settled that the government need not disclose the identity of informers unless it appears that disclosure is necessary or desirable to show defendant's innocence. United States v. Li Fat Tong, 2 Cir., 1945, 152 F.2d 650; and cases there cited; 8 Wigmore on Evidence, 3d. ed., Sec. 2374(f). This necessity is not present here. Even if the informant were a wire-tapper defendants did

not thereby gain any immunity from prosecution for a subsequently committed crime. The unlawful interception of telephonic communications does not give the participants immunity as to all criminal enterprises planned or discussed, which are overheard by law enforcement officers. Plans and details of proposed criminal ventures so arranged may not be carried out and perfected with impunity, for no license or privilege to commit crime is conferred on wrongdoers by reason of the fact that the wires over which they talk are unlawfully tapped by agents.

The contention of the defendants that all the testimony of the agents who surveilled them on the days above set forth, concerning their observation of defendants' activities, should be excluded solely because advance knowledge was gained of defendant Coplon's trips to New York City by unlawful interceptions, is without merit. The testimony establishes that Howard B. Fletcher, Inspector of the Bureau, notified Special Agent Delavigne on December 31, 1948 that a very important case would be assigned to the Washington Field Office of the Federal Bureau of Investigation. On January 3, 1949, Fletcher and Delavigne conferred concerning this case and discussed the necessity of surveilling the activities of defendant Coplon. They knew that the suspected criminal enterprise involved espionage. A field investigation was instituted on January 4, 1949 and inquiry made as to the residence of this defendant. Agents were instructed, on January 6, 1949, to conduct a surveillance of the movements of this defendant when she left work in the Department of Justice. She was observed leaving at 5:25 p. m. on that day with a man later identified as H. S. The surveillance was continued until about 6:30 p. m. that evening. Thus, it is evident that not only was defendant Coplon under suspicion, but also that an investigation had been instituted and active surveillance undertaken before any telephone messages were intercepted by the agents. (The first tap was installed on the telephone of the Coplon Washington apartment at 4 p. m. on January 6, but the first interception did not take place until 6:57 p. m.). Thereafter, she was kept under almost constant surveillance.

Regarding this defendant's trips to New York, the government introduced the testimony of William E. Foley, her superior in the Department of Justice. Foley testified that prior to each trip she asked his permission to leave work early so that she could catch an early train. Specifically, he testified:

(1) Jan. 14 trip: Coplon asked him a day or two before for permission to leave early to go to New York; Foley relayed this information to Agent Palmer;

(2) Jan. 19 trip: Coplon told him on January 18 that she was planning to go to New York for the long inauguration weekend; she asked for leave to depart early; Foley informed Fletcher of her plans;

(3) Feb. 18 trip: A day or two prior to the 18th Coplon asked permission to leave early in the afternoon of the 18th in order that she might go to New York; after she left Foley telephoned this information to Fletcher;

(4) March 4 trip: On March 2, Coplon requested permission to leave for New York early on March 4; Foley informed Fletcher.

That Foley informed the F.B.I. of Coplon's intended trip to New York on January 14, is substantiated by the affidavits and testimony of Clive W. Palmer, Leo Laughlin, Thomas Mendenhall and Kenneth Delavigne, all special agents. Fletcher, by affidavit and testimony, confirms the testimony of Foley regarding the information of the February 18 and March 4 trips.

The government has established to my satisfaction that it is in possession of evidence of Coplon's trips to New York, distinct and wholly independent of any advance information of the contemplated trips gained through telephonic and microphonic interceptions. It has proof of "tangible, physical actions separate and apart from what may have been said about them over the telephone," which is admissible. United States v. Weiss, D.C.S.D.N.Y., 34 F.Supp. 99.

Although it is somewhat speculative, it is also probable that the agents would have gained information of the New York trips from the surveillance under which the defendant Coplon had been placed. The surveillance was justified, not alone by the information obtained through illegal interceptions, but from the nature of the suspected criminal enterprise and the elusive tactics of the defendants at their New York meeting on January 14. The agents who surveilled them at that meeting, testified to their suspicious conduct in attempting to elude observation, and stated that their behavior aroused suspicion of criminal activity and was indicative of the *modus operandi* usually followed in espionage.

The Testimony of H. S.:

If the defendants should raise the defense that the meetings of the defendants were not for the purpose of furthering the ends of the conspiracy, but were in reality lovers' meetings, the government has indicated that it will present evidence of defendant Coplon's tryst with H. S. on the weekend of January 8, 1949. The transcripts of the intercepted messages revealed that the agents had knowledge of a forthcoming trip of Coplon and H. S. to Baltimore, by reason of the conversations intercepted on January 6 and 7, 1949.

The court permitted H. S. to be called as a witness at the pre-trial hearing for the limited purpose of ascertaining whether the disclosures he is purported to have made to the government were voluntary, or whether they were induced by the fact that the government was in possession of the contents of intercepted conversations between defendant Coplon and him. If the latter were true, any testimony at the trial might have to be excluded by reason of the decisions of the Supreme Court in United States v. Weiss, and Goldstein v. United States, supra. However, H. S. testified that after defendant Coplon's arrest he voluntarily went to his superior in the Department of Justice, who is one of the prosecuting attorneys in this case, and disclosed the facts of his acquaintance with the defendant. He said that, at the time, he had no knowledge that any of his conversations with the defendant had been intercepted. Counsel for defendant Coplon also asserts that H. S. acted under the supervision and direction of and in collusion with law enforcement officers in promoting his relationship with her, in order to obtain evidence against her. H. S. testified that he never acted at their direction or in collusion with them in his relations with Coplon.

▆ From this I conclude, that H. S. will be a competent witness if it is deemed necessary at the trial to call for his testimony in rebuttal, that he was not induced to testify or make the disclosures, it is said he made, by the government's possession of the intercepted messages, and that the evidence of his trip with Coplon may be admissible, depending of course on the aspect the trial may take.

Denial of Return of Records of Intercepted Messages:

▆ Defendants pray that the government be directed to turn over to them all records, recordings, transcripts and notes of intercepted messages. In United States v. Weiss, D.C., 34 F.Supp. 99, defendants requested the "return" of similar documents. The court there ruled that it could not order the return to defendants of that which was not theirs originally. The difference in the term here used will not lead to an opposite result: the records and transcripts have been marked in evidence as exhibits of the court; defendants have been granted access to them, as heretofore indicated; the government will not be directed to turn them over to defendants physically; they remain in the custody of the court.

Mail Covers and Trash Covers:

It is defendants' contention that certain mail and trash cover records were made by government agents. By mail cover records, defendants intend to designate the records made by copying such writings and marks as appear on mail wrappers; by trash cover records, they refer to the results of exploring through wastepaper baskets and rubbish and piecing together torn and discarded writings.

Congress has prohibited the wilful obstruction or delay of the passage of mail, 18 U.S.C.A. § 1701; it has forbidden the

taking of mail from any authorized depository before delivery with design to obstruct correspondence or pry into the secrets of another, and the opening, secreting, embezzling or destroying of it, Sec. 1702; it has declared unlawful the detaining, delaying, etc. of mail by a postal service employee or his permitting another to do so, Sec. 1703.

Section 41.4 of the 1948 Postal Laws and Regulations, 39 Code Fed.Regs 92, provides that information concerning mail matter shall not be given to unauthorized persons, but that "postmasters may give to officers of the law, upon proper identification, to aid in the apprehension of fugitives from justice information regarding the addresses, return cards, or postmarks on mail matter, but shall not withhold such mail from the addressees or delay its delivery." The sources of such information are the return addresses and postmarks which have been put on the wrappers as an aid to the post office. The return address which is placed on the wrapper by the sender is a voluntary disclosure, so that if the addressee is not located, the matter may be returned. The postmark is placed on the wrapper by the post office, its purpose is to cancel the postage and note the place of mailing. There is nothing contained in these mail cover records, which is either secret or confidential, and no right of privacy either of the sender or the addressee is invaded by the making of such records. There is no reason why this information should not be available to law enforcement agents. No law prohibits such disclosure.

No evidence was presented by defendants showing that the mail of either was unlawfully opened or delayed, nor was any proof offered as to the method of obtaining the trash covers (and the government denied that the method alleged was pursued). The government did show by affidavit, which was uncontradicted, that with respect to defendant Coplon no mail cover was carried on in New York and that in Washington, where one was in effect from January 5 to July 13, 1949, no information of any relevance or value was so procured; and that with respect to the other defendant although a mail cover was maintained at his residence the results were also negative.

Decisions on Motions:

I therefore conclude and rule on the motions, as follows:

(1) the motions are granted to the extent that they seek the suppression of all records, transcripts and notes of any kind made from intercepted telephonic communications of the defendants and the microphone-telephone communications of defendant Coplon, and the suppression of all evidence obtained as a result or use of such intercepted communications, except as that evidence has been demonstrated to me to spring also from independent sources, as herein indicated;

(2) the motions are denied in so far as they seek a direction from the court that the government turn over and deliver to defendants all records, recordings, transcripts and notes of such communications;

(3) the motions are denied in so far as they seek the suppression of all notes and memoranda obtained as a result of intercepting mail addressed to or sent by defendants and all evidence obtained as a result thereof;

(4) the motions are denied in so far as they seek a dismissal of the indictment upon the ground that the proof of the charges contained therein is founded solely on evidence illegally obtained. The government has shown to my satisfaction that it does have independent proof of the facts obtained by telephone and microphone interceptions. Although much of this independent proof depends on the credibility of the witness, Foley, the court cannot and will not now determine that his testimony is not worthy of belief. There is at this time no basis for such determination; that is a matter which must be left to the trial jury;

(5) that portion of defendant Gubitchev's motion which seeks a direction that the government turn over to him all notes, information and memoranda of mails addressed to or posted by him is denied;

(6) that portion of defendant Gubitchev's motion which seeks the suppression of all records, transcripts and notes of any kind

made by dictaphone recordings of the voice of this defendant, or any dictaphone recordings made from his home or place of work, and which seeks a direction that the government turn over to him such recordings, transcripts and notes thereof is denied. There has been no proof of any kind whatsoever that such an instrumentality was used in the investigation in this case, in so far as this defendant is concerned.

(7) that portion of the motions which seeks a dismissal of the indictment upon the ground that the proof in the government's case stems from unlawful and illegal interceptions may be renewed by defendants at the close of the presentation of the evidence on trial, which is now set to commence before me on January 24, 1950 at 10:30 a. m. The motions will then be reconsidered in the light of the government's proof as developed on the trial.