STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. NICHOLAS VANDERHAVE, ET AL., DEFENDANTS, AND SAMUEL GIARDINA, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 14, 1957—Decided November 25, 1957.

484

Before Judges CLAPP, JAYNE and HUGHES.

*Mr. Nicholas A. Carella* argued the cause for appellant.

*Mr. Archibald Kreiger,* Deputy Attorney-General, argued the cause for respondent (*Mr. Charles S. Joelson,* Deputy Attorney-General, Acting Prosecutor of Passaic County, attorney).

The opinion of the court was delivered by

HUGHES, J. A. D. Upon trial of an indictment charging them with conspiracy to steal in violation of *N. J. S.* 2A:98–1(a) and *N. J. S.* 2A:119–2(a), the defendants Vanderhave, Vachon and Rosen entered pleas of *non vult* in the course thereof, the jury convicted Hollmond and Giardina, and the latter appeals. Of the two points addressed to our attention, the first involves the *quantum* of evidence on the issue of the asserted impropriety of denial of the motion for acquittal at the end of the State's case, and the second suggests error of substance in the admission of a specific item of evidence.

As to the right of appellant to the trial dismissal sought, we are able to glean from the unduly abbreviated record presented by him (which would justify our ignoring of this point, *R. R.* 1:7–1(f); *State v. McFadden,* 32 *N. J.*

*Super.* 258 (*App. Div.* 1954); *State v. Wilkerson,* 38 *N. J. Super.* 166 (*App. Div.* 1955)) a skeletal understanding of the evidence sufficient for decision. The victim of the thefts encompassed by the unlawful cabal in issue was the Pantasote Leather Company, which is located in Passaic. Vachon and Vanderhave were employees thereof, the latter a receiving and distribution clerk whose function as storekeeper of the company's inventory enabled him, with the assistance of Vachon, to withdraw, by false requisitions and otherwise, pigments, chemicals and plastic material, of some value, for delivery to those corruptly linked with him. Hollmond was a trucker who transported goods in regular course to and from Pantasote, and his part in the criminal venture was to function as the medium of transshipment of the booty. Rosen and Giardina received the goods, and it was that status in the conspiratorial plan that underlies appellant's insistence that as the receiver of such stolen goods (a substantive offense implying separate responsibility to the law, *N. J. S.* 2*A*:139–1), he could not also justly be deemed punishable for the thefts thereof. *State v. Krupin,* 100 *N. J. L.* 7 (*Sup. Ct.* 1924), affirmed 101 *N. J. L.* 228 (*E. & A.* 1925); *State v. Fox,* 12 *N. J. Super.* 132 (*App. Div.* 1951); *State v. Shelbrick,* 33 *N. J. Super.* 7 (*App. Div.* 1954).

It is true that the receiver of stolen goods and the thief are not accomplices (*State v. Rachman,* 68 *N. J. L.* 120 (*Sup. Ct.* 1902); *State v. Hoffman,* 90 *N. J. L.* 338 (*E. & A.* 1917)), the receiver being guilty of a distinct substantive offense not implying a relationship as accessory to the antecedent theft. The larceny and receiving being offenses of separate and inconsistent nature, there results the legal concept that the receiver must be someone other than the thief, or as our court has stated, "* * * that a person cannot be guilty of larceny and receiving of the same property." 2 *Burdick, Law of Crime* (1946), § 608, *p.* 436; *State v. Shelbrick, supra; State v. Rose,* 41 *N. J. Super.* 434 (*App. Div.* 1956). But the gist of the offense of conspiracy consists in the unlawful confederation, and not in

the overt acts designed to carry it into effect. A conspiracy to commit an offense is a separate and distinct offense from the substantive crime planned and consummated. *State v. Chevencek*, 127 *N. J. L.* 476 (*Sup. Ct.* 1941); *State v. Oats*, 32 *N. J. Super.* 435 (*App. Div.* 1954). Recently, a searching scrutiny by this court of the record of a conspiracy conviction (although on another point) in a case similar to that *sub judice*, in which the fruits of the theft contemplated by the evil confederation came into the possession of one of the conspirators (who would undoubtedly also have been classifiable, substantively, as a receiver thereof), evoked no comment of significance thereon from the court. *State v. Scala*, 38 *N. J. Super.* 568 (*App. Div.* 1956). The conspiratorial role of appellant, alleged and proven by the State, transcended the function of a receiver of stolen goods, even one with foreknowledge of the intended theft. The conspiracy plan here was one of continuity; the primary thief and the appellant agreed upon details of the unlawful design and its *modus operandi;* it is not an exaggeration to say that the proof was susceptible of a finding that appellant had participated in supervising the detail, particularly the timing, of certain larcenies, and showed a selectivity in pointing out the type and quantity of material which should be stolen for his use, complaining at one time that drums of stolen material were not filled to his liking; Vanderhave and appellant agreed upon the elimination of another receiver, one Sparta, to whom some of the goods then were being sold, agreeing on a division of the additional profits thereby realized; and in other respects these conspirators were shown to have been *en rapport*, not in the naked buy and sell relationship of a thief and his receiver, but in the clandestine and consultative concert of planned action which is the hallmark of the criminal conspiracy. The proofs were adequate to sustain the conviction therefor. *Cf. State v. Salimone*, 19 *N. J. Super.* 600 (*App. Div.* 1952); *State v. Goodman*, 9 *N. J.* 569 (1952); *State v. Carbone*, 10 *N. J.* 329 (1952); *State v. Yedwab*, 43 *N. J. Super.* 367 (*App. Div.* 1957).

Vanderhave, the unfaithful steward, was a trial witness for the State. Partially cumulative to his narration of guilty conversations with appellant, was the testimony of one Mrs. Kolano, a switchboard operator at the Pantasote establishment. Her suspicions having been attracted to furtive telephone conversations of Vanderhave with persons outside the plant, passing through the common company switchboard, she listened to such conversations without the knowledge of the participants. Reporting these matters to one in authority, she continued to eavesdrop, and testified at the trial in support of Vanderhave's version of telephone conversations which he had had with appellant.

The second point of the appeal deals with the legitimacy as evidence of such matter, the appellant contending that under the "wire tap" statute, *N. J. S.* 2A:146–1, these conversations were improperly admitted into evidence. That statute reads as follows:

"2A:146–1. Tapping telegraph or telephone lines: disclosing messages
 Any person who willfully and maliciously:
 a. Cuts, breaks, taps or makes any connection with a telegraph or telephone line, wire, cable or instrument belonging to any other person; or
 b. Reads, takes, copies, makes use of, discloses, publishes or testifies concerning a message, communication or report intended for any other person and passing over any such telegraph or telephone line, wire or cable in this state; or
 c. Uses any apparatus unlawfully to do any of such acts—
 Is guilty of a misdemeanor." *L.* 1930, *c.* 215, § 1, *p.* 987)

█ The sworn identification of appellant's voice, and the reference to his telephone number, was sufficient to support this evidence (*State v. Dillingham,* 134 *N. J. L.* 229 (*E. & A.* 1946); *cf. State v. O'Donnell,* 8 *N. J. Super.* 13 (*App. Div.* 1950); *State v. Carrano,* 27 *N. J. Super.* 382 (*App. Div.* 1953)), and since the utterances of the conspirators related to the *corpus* of the conspiracy object (*State v. Yedwab, supra; State v. Sudol,* 43 *N. J. Super.* 481 (*App. Div.* 1957)), the evidence was substantively admissible. Appellant insists, however, on the postulate that the overhearing

of these conversations was within the ambit of the statute, that their divulgence, even in the respectable aura of testimony thereof in a jurisdictional court, would amount to a misdemeanor under the statute, and, accordingly, that such evidence was wrongfully admitted. *Vide,* dissenting opinion in *Olmstead v. United States,* 277 *U. S.* 438, 48 *S. Ct.* 564, 72 *L. Ed.* 944 (1928); and *Nardone v. United States,* 302 *U. S.* 379, 58 *S. Ct.* 275, 82 *L. Ed.* 314 (1937); *Weiss v. United States,* 308 *U. S.* 321, 60 *S. Ct.* 269, 84 *L. Ed.* 298 (1939); *Nardone v. United States,* 308 *U. S.* 338, 60 *S. Ct.* 266, 84 *L. Ed.* 307 (1939); *cf. Goldman v. United States,* 316 *U. S.* 129, 62 *S. Ct.* 993, 86 *L. Ed.* 1322 (1942); *Wolf v. People of the State of Colorado,* 338 *U. S.* 25, 69 *S. Ct.* 1359, 93 *L. Ed.* 1782 (1949); *OnLee v. United States,* 343 *U. S.* 747, 72 *S. Ct.* 967, 96 *L. Ed.* 1270 (1952); *Schwartz v. State of Texas,* 344 *U. S.* 199, 73 *S. Ct.* 232, 97 *L. Ed.* 231 (1952); *Salsburg v. State of Maryland,* 346 *U. S.* 545, 74 *S. Ct.* 280, 98 *L. Ed.* 281 (1954); *Irvine v. People of the State of California,* 347 *U. S.* 128, 74 *S. Ct.* 381, 98 *L. Ed.* 561 (1954).

We shall pass the question of the propriety of admitting this evidence even though, *arguendo,* unlawfully obtained, because evidential *per se,* under our long-standing rule permitting evidence of that nature. *State v. MacQueen,* 69 *N. J. L.* 522 (*Sup. Ct.* 1903); *State v. Merra,* 103 *N. J. L.* 361 (*E. & A.* 1927); *State v. Pinsky,* 6 *N. J. Super.* 90 (*App. Div.* 1950); *State v. Alexander,* 7 *N. J.* 585 (1951); *cf. Application of Berlin,* 19 *N. J.* 522 (1955); but *cf. Eleuteri v. Richman,* 47 *N. J. Super.* 1 (*App. Div.* 1957). We think, too, that discussion of the moral aspects of wire tapping would here be an act of supererogation (*Olmstead v. United States, supra;* "Wiretapping—A Dirty Business," 79 *N. J. L. J.* 412 (*Oct.* 1956)), even in its role in the enforcement of law (*State v. Tracey,* 100 *N. H.* 267, 125 *A. 2d* 774 (*Sup. Ct.* 1956); *Morss v. Forbes,* 24 *N. J.* 341 (1957)).

█ We think that the intentional overhearing of the conversations in the instant case did not fall within the in-

terdiction of the statute. It cannot be doubted that *section* (*a*), *supra,* inhibits the mechanical wire "tap" of a telephone line or facility belonging to any other person, whereas *section* (*b*) deals with the taking or use of a message intended for any other person "passing over any such * * * telephone line," *section* (*c*) forbidding the use of any apparatus unlawfully to accomplish such acts. There was here, of course, no mechanical "tap" by Mrs. Kolano, who merely kept her board switch open and listened to the conversations. This invasion of privacy was eavesdropping, which *Blackstone* has described in his *Commentaries:*

"Eaves-droppers, or such as listen under walls or windows or the eaves of a house to hearken after discourse, and thereupon to frame slanderous and mischievous tales, are a common nuisance and presentable at the court-leet; or are indictable at the sessions, and punishable by fine and finding sureties for their good behaviour." 2 *Bl. Comm.* 1340.

It should be noted that such eavesdropping was done, presumably, under the authority of Mrs. Kolano's employer, the proprietor of such facility, and for the protection of its property interest. *Cf. People v. Applebaum,* 277 *App. Div.* 43, 97 *N. Y. S.* 2d 807 (*App. Div.* 1950). But assuming that Vanderhave's use of the wire made him its possessor *pro tem* so that her act would relate to a wire "belonging to any other person," we believe that the nonmechanical monitoring of such conversations cannot be classified as coming within the terms of the statute. We incline to the view that the forbidden appropriation of a message "passing over any such * * * wire," described in *section* (*b*) of the statute, refers back to a wire "belonging to any other person" with which there has been the mechanical interference, or "tap," described in *section* (*a*) thereof. Although eavesdropping under such circumstances is a comparable invasion of privacy, the focal question here is the correct construction of the statute, as to whether it extends to such an act. It may be noted that other courts have held that eavesdropping on an extension telephone (the practical counterpart of what was done here) is not considered a wire

"tap," so called, within section 605 of the Federal Communications Act. 47 *U. S. C. A.* § 605; *People v. Pustau,* 39 *Cal. App.* 2d 407, 103 *P.* 2d 224 (*Ct. App.* 1940); *People v. Collins,* 80 *Cal. App.* 2d 526, 182 *P.* 2d 585 (*Ct. App.* 1947); *Rathbun v. United States,* 236 *F.* 2d 514 (10 *Cir.* 1956); *cf. Irvine v. People of the State of California, supra;* but see *United States v. Polakoff,* 112 *F.* 2d 888, 134 *A. L. R.* 607 (2 *Cir.* 1940); *United States v. Gruber,* 123 *F.* 2d 307 (2 *Cir.* 1941).

Legal and social implications of wire tapping are under study by the New Jersey Legislature, under *Senate Concurrent Resolution No.* 4 (1956), creating the "Joint Legislative Committee to Study Wiretapping and the Unauthorized Recording of Speech." *Morss v. Forbes, supra.* Testimony before that committee is said (79 *N. J. L. J.* 412, *supra*) to have included proof "* * * that devices and techniques for electronic eavesdropping have developed to such a point that almost all affairs and conversations (even those carried on vis-a-vis) can be intercepted by such devices without actual tapping or plugging in, and that such conduct may not be covered by our wiretapping statute * * *," a vindication of the prophetic envisionment of such scientific marvels by Mr. Justice Brandeis in his dissenting opinion in *Olmstead v. United States, supra.* It was in 1930, but two years after *Olmstead,* that *N. J. S.* 2A:146–1, *supra,* was enacted, and we are constrained to believe that the legislators then did not foresee the scientific advances which since have occurred, and that the statutory inhibitions were intended to comprise an integrated whole in providing for (a) the prohibition of mechanical interference or "tapping" of the communication facility, and (b) making criminal the seizure or use of the conversations overheard through such invasion of privacy. Upon this reasoning, the statute would not cover "eavesdropping," as here; *cf. Goldman v. United States, supra,* holding that recording of defendant's conversation spoken into a telephone receiver, with the aid of a sensitive listening device on the wall of an adjoining room is neither a "communication" nor an "interception" under

section 605 of the Federal Communications Act, *supra*. It is noteworthy that our sister state of New York, having completed a legislative study of the problem such as now engages our legislative committee (*Legis. Doc.* 53 (1956)), recently has enacted a completely revised law on eavesdropping and wire tapping. *McKinney's Laws, Penal Law,* c. 40, *Art.* 73, § 738 *et seq., L.* 1957, c. 881.

 Penal statutes are to be construed strictly against the State, for statutes creating and defining crimes cannot be extended by intendment. The condemned act must be plainly and unmistakably within the statute. *Todd v. United States,* 158 *U. S.* 278, 15 *S. Ct.* 889, 39 *L. Ed.* 982 (1895); *United States v. Resnick,* 299 *U. S.* 207, 57 *S. Ct.* 126, 81 *L. Ed.* 127 (1936). Accordingly, any doubt as to the meaning of the statute is to be resolved in favor of the strict construction thereof. *State v. Low,* 18 *N. J.* 179, *vide,* dissenting opinion of Mr. Justice Heher (1955).

 We thus reach the determination that such "eavesdropping," the covert listening to a telephone conversation through an extension telephone or switchboard without the knowledge of the participants, while a generally reprehensible invasion of the right of privacy, is not within the compass of our present wire tapping statute, *N. J. S.* 2A:146–1, *supra,* the effect of such statute being limited to mechanical interference or connection with facilities of communication, as described in *section* (*a*) thereof. It follows that the admission of the evidence of Mrs. Kolano, as to conversations overheard by her in the manner shown, was not erroneous. We do not imply that a contrary finding, namely, that *section* (*b*) should be broadly interpreted to include the instant eavesdropping, would lead us to a different result, for that would entail a study of the relationship of the evidence admitted (which was, at least, partially cumulative to other testimony in the case) to the concept of manifest wrong or injury to the appellant (*R. R.* 1:5–1, *supra*), and such consideration is unnecessary for the purpose of our present decision.

The judgment of conviction is affirmed.