Samuel H. Hofstadter, J.
Late in the evening of June 9,
1958, police officers entered petitioner’s apartment and there arrested her and her companion; at the same time they took from her safe $1,800 in currency. They had neither a warrant for arrest nor a search warrant. Next day the defendant and the other individual were charged in the Magistrates’ Court with conspiracy to commit the crime of abortion; and thereafter an information was filed in the Court of Special Sessions charging that misdemeanor.
The petitioner was acquitted after trial in Special Sessions and instituted the present proceeding to direct the Police Commissioner to return the $1,800. This is resisted by him on various grounds, none of which I find tenable.
The application is granted.
*987 The arrest was manifestly unlawful, for admittedly the petitioner did not commit nor attempt a crime in the presence of the police officers. Since there was no claim that she was arrested for the commission of a felony or in the reasonable belief on the part of the arresting officers that she had committed a felony which had in fact been committed, the officers could not lawfully arrest the petitioner except for a crime committed or attempted in their presence. (Code Crim. Pro., § 177, subd. 1.)
The arrest being unlawful and the search having been made without a search warrant or other lawful process, the search was unreasonable and in defiance of the constitutional mandate. (People v. Defore, 242 N. Y. 13, 18; Jones v. United States, 357 U. S. 493, 497-498; Miller v. United States, 357 U. S. 301; Taylor v. United States, 286 U. S. 1, 6; Agnello v. United States, 269 U. S. 20, 33.) The riding rough-shod over the rights of a citizen in defiance of the Constitution smacks of the tyranny of the police state; it is not in keeping with a free society under democratic government.
If a police officer who enters a home without a search warrant, in the course of an illegal arrest makes a search and then seizes the property of the home owner, can successfully resist the application of the owner, made after acquittal of crime, for its return, by the unsupported assertion, as here made, that the property is the fruit of criminal activity, the constitutional protection against unreasonable search and seizures will have ceased to exist. Denial of relief in such circumstances puts a premium on official lawlessness and places the citizen at the mercy of high-handed autocracy. When this kind of tyranny occurs elsewhere, it is shocking; when it strikes here, it is terrifying.
The eonclusory statement of the detective who made the actual seizure that he believes “ the $1,800 involved herein are the proceeds of petitioner’s illegal abortion activities ”, is not fortified by evidence and clearly furnishes no ground for withholding the property. It is wholly insufficient to put in issue the lawfulness of the petitioner’s ownership of the money taken from her in her home.
While the right of the People to be secure against unreasonable searches and seizures given by the Civil Rights Law (§8) and now embodied in the Constitution of the State (art. I, § 12) is not violated by a search and seizure incident to a lawful arrest (People v. Chiagles, 237 N. Y. 193, 195; United States v. Rabinowitz, 339 U. S. 56, 60), the search and seizure in this case were not of that character. The money came into the *988 property clerk’s possession solely as the result of the unlawful search and seizure perpetrated in the invasion of the petitioner’s constitutional rights.
Any suggestion that the court, in upholding the right here sought to be vindicated, interferes with law enforcement and the suppression of crime is best answered by what was said by the court in the very recent case of Miller v. United States (357 U. S. 301, 313, supra): “We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. * * * the history of the criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness.”
And in Weeks v. United States (232 U. S. 383, 393) the court said: “ The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. ’ ’
In this time of crisis and resultant confusion it is especially important that we insist on observance of our ancient liberties. For there are those, even in high places, who postulate that now certain “ small freedoms ” are expendable. We must decisively reject that corrosive invasion of our heroic heritage. In no uncertain terms, we must make it manifest that no freedom is small or expendable! We must cling to our intuitions of ordered freedom which preclude the State as well as individuals from pursuing even desirable objectives with dubious or evil expedients. ‘1 Liberty is secreted in the interstices of procedure,” said Sir Henry Maine.
If prudence is no shame to valor, self-restraint is not unbecoming to governmental power. The abuse, here, of constituted authority was a flagrant manifestation of the “insolence of office”; we are bound by every means at our disposal to condemn it, lest respect for law and order be undermined. “ The untainted administration of justice [is] one of our proudest boasts [and] one of the most cherished aspects of our institutions.”
It becomes appropriate to note at this point, perhaps, that the trial is over and the District Attorney has certified to the property clerk of the Police Department that his office has no further need for the money taken from the petitioner. In no *989 event, therefore, are we concerned here with the doctrine of the courts of this State that evidence is admissible, no matter how reprehensible the steps by which it has been secured. (People v. Defore, 242 N. Y. 13, supra; People v. Richter’s Jewelers, 291 N. Y. 161, contrary to the rule applied by the Federal courts, Nardone v. United States, 308 U. S. 338; Weiss v. United States, 308 U. S. 321; Nardone v. United States, 308 U. S. 338; Weiss v. United States, 308 U. S. 321; Nardone v. United States, 302 U. S. 379; Agnello v. United States, 269 U. S. 20, supra; Weeks v. United States, 232 U. S. 383, supra.) The admissibility in evidence on the defendant’s criminal trial of the fruits of the forbidden search is not here directly in issue.
But there has been recently a certain uneasiness in our courts regarding the principle of admissibility of tainted evidence. This is salutory. For the time has come that it is important to recognize as part of the law of evidence, that governments’ unrestrained search for fact may adulterate the very truth we seek to establish. Our State courts, like the Federal courts, should categorically reject the use of any evidence tainted by illegal procurement; they should vindicate their traditional leadership by following a rule of absolute inadmissibility. The doctrine need not be regarded as so deeply entrenched, that it is beyond recall by decisional law.
In today’s climate of public conscience, the rule is outmoded. Time and again, the gap between moral and legal law has been spanned — sometimes by the slow and painful process of the innovation of time, and sometimes by a courageous leap into the future. Such an advance should be effected by our State courts, as it has been by the Federal courts. The Federal rule had a checkered career; taldng its point of departure from Boyd v. United States (116 U. S. 616), as our rule stems from People v. Adams (176 N. Y. 351), after some oscillations, it is now firmly established (see Benanti v. United States, 355 U. S. 96).
The enlightened judicial leadership in the appellate courts of our own State has never been lacking to initiate a salutary advance in the law. Judge Desmond summed it up: “ Our court said, long ago, that it had not only the right, but the duty to re-examine a question * ® * to bring the law into accordance with present day standards of wisdom”. (Woods v. Lancet, 303 N. Y. 349, 354-355; see, also, Bing v. Thunig, 2 NY 2d 656.)
Cardozo’s measured cadences in People v. Defore (242 N. Y. 13, supra) are no longer persuasive in this area. The concepts they evoke now remain flat in line without depth or perspective.
*990 “ The constable has blundered” was deficient in a sense of reality; poetic license only justified the expression. The constable had not blundered — he had willfully violated the law and due process. Every pragmatic, as well as moral, consideration militates strongly against admissibility of illegally obtained evidence; its logic is in a fourth dimension.
As Learned Hand, J., observed in United States v. Pugliese (153 F. 2d 497, 499) exclusion is the only practical way of enforcement. “ Only in case the prosecution which itself controls the seizing officials, knows that it cannot profit by their wrong, will that wrong be repressed.” Justification for the use of illegal evidence is that its rejection would hamper prosecution. “ That is always the justification of the police. That I submit is a philosophy repellent to our tradition * # *
I speak the conscience of the law when I say it should be condemned.” (Justice William Douglas, Address to the American Institute, May 20, 1953.)
For, though crime must be repressed, in that repression we must not transform our society into a lawless one in which the officials of the law themselves are encouraged to stoop to illegality. Discretion is something one has to be discreet about, it has been said. The law is something we ought to be required to be lawful about! If we may rightly ask how shall there be justice if the judge be not just, we may also ask how shall there be respect for the law of authority, if authority is not required to respect the law? As we have been admonished: “ For good or for ill * * * [government teaches] the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for law ” (Olmstead v. United States, 277 U. S. 438, 485, Brandeis, J., dissenting).
The social need for law enforcement must not be permitted to overwhelm the rights of citizens. Our American way of life is based on the confidence of the citizen in his government. In a democracy, we are concerned primarily with the relation of the individual to his government — a just government. And the maintenance of this over-all relationship has greater importance than the isolated search for fact in any specific case. “Every kind of polity has a pragmatic need for due process, simply because it is a condition sine qua non of the lasting efficacy of every variety of law.” (Professor Edmond Cahn, “ The Sense of Injustice ”.) We have put a “ ceiling price on truth ” in a legal proceeding. Just as we have abandoned the thumbscrew and the rack — at one time considered legitimate methods of extracting evidence — civilized law must abandon *991 the taint of illegality. A wholesome body politic requires no meretricious medicaments; tainted evidence can secure only a tarnished victory!
The supreme vice of the admissibility of illegally secured evidence is in violating its own being — its first principle. For the first principle of all being is that it justify itself. But how can use of an abuse justify itself? “ The contrast between morality professed by society and immorality practiced on its behalf makes for contempt of law. Respect for law cannot be turned on and off as though it were a hot-water faucet. ’ ’
For society to employ illegally obtained evidence is to inflict self-harm. Such violence to its moral sense is a failure in due process vis-á-vis the community itself. Holmes’ rejection of “ dirty business ” is a stark rendition of the essence of “ due process” cornerstone of ordered freedom. This is the “ law of the land ” formulated by the Barons at Runnymede, and its equivalent “ due process ” — implicit in the Constitution adopted at Independence Hall! The moral imperative that only just means may be employed to secure righteous ends should be a legal imperative too — an overriding principle to rule in all things affecting the community — especially in the enforcement of law and the administration of justice.
Reverting to the more immediate problem involving the question of unlawful search and seizure, the respondent does not meet the petitioner’s charge that the search was without authority of law and wholly wrongful. He insists, however, that despite this infirmity, the petitioner must be denied relief because she has mistaken her remedy. The respondent urges that she be relegated to an action in replevin against the property clerk; he goes further and argues that the failure to make the property clerk a party to the present proceeding renders it defective and requires its dismissal.
Chapter 18 of the New York City Charter provides for the Police Department, the head of which is the Police Commissioner (§ 431), who shall have control of the “ government, administration, disposition and discipline ” (§ 434) of the department and of its police force. The Commissioner is the chief executive officer of the police force and is made chargeable with the execution of all laws and the rules and regulations of the department (§ 435). The charter makes no mention of the property clerk.
The property clerk is dealt with in chapter 18 of the Administrative Code under the heading of the Police Department. It is declared that the Police Commissioner “ shall employ a *992 property clerk ” and may require and take security for the faithful performance of his duties (§§ 435-4.0, 435-4.1). While the duties of the property clerk so to be employed by the Commissioner and the manner of their discharge are there prescribed in some detail, there is no indication that the property clerk in performing his functions acts other than as an employee of the Police Department, appointed by and subject to the control of the Police Commissioner. There is no suggestion that he constitutes an independent department or agency. The respondent’s contention that the proceeding is improperly brought against him was rejected in a closely analogous situation (Matter of Silfa v. Kennedy, 5 Misc 2d 375).
It is not amiss to recall in this connection that the money claimed by the petitioner, now in custody of the property clerk, was taken from her not by him, but by members of the police force. If, therefore, the petitioner is entitled to an order for the return of her property, the order for its return may properly be directed to the respondent. In the cases cited by respondent, the property clerk had lawfully obtained possession of the property claimed by the plaintiffs (Costello v. Simmons, 295 N. Y. 801; Hofferman v. Simmons, 290 N. Y. 449). The money in this case having been wrested from the petitioner unlawfully by the respondent’s subordinates, themselves under the sworn duty to obey and enforce the law, the respondent must be directed to restore it to her promptly.
The provisions of the Administrative Code invoked by the respondent presuppose lawful acquisition and possession by the property clerk; they are irrelevant when, as here, the property has come into his hands through the use by police officers of main force in disregard of its owner’s constitutional rights.
The application is granted, and the respondent is directed to return the property to the petitioner.
Settle order.