JOSEPH J. ROWAN ET AL *v.* STATE OF MARYLAND
[No. 28, October Term, 1938.]

548

*Decided January 10th, 1939.*

The cause was heard before BOND, C. J., OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Stedman Prescott,* for the appellants.

*Hilary W. Gans, Deputy Attorney General,* with whom were *Herbert R. O'Conor, Attorney General,* and *James H. Pugh, State's Attorney for Montgomery County,* for the State.

MITCHELL, J., delivered the opinion of the Court.

The appellants, Joseph J. Rowan and Eleanor E. Rowan, in conjunction with a certain Abraham Kline, were indicted in Montgomery County, Maryland, and elected to submit their case to the Judges of the Circuit Court for that county for trial. The verdict of the court being not guilty as to Kline, but guilty as to the other two traversers, the latter have appealed from the respective judgments entered on the respective verdicts against them.

The indictment under which the appellants were convicted contains eleven counts, charging the traversers in various forms with unlawfully making and selling books or pools on horse races, and with keeping a house for the purpose of betting and gambling in divers manners. The court, sitting as a jury, found the appellant John J. Rowan guilty on the first nine counts in the indictment, which in effect embraced the charges of unlawfully making and selling books or pools on horse races; and it found the appellant Eleanor E. Rowan guilty on the fifth and seventh counts of said indictment, which more particularly embraced the charges of knowingly keeping and occupying or suffering to be kept and occupied a house for the purpose of betting and gambling in divers manners and selling books or pools upon the results of races.

At the trial of the case the State first produced Raymond B. Leavitt, manager of the Shepherd telephone exchange of the Chesapeake and Potomac Telephone Company, who testified that, according to the original records of the company, the name of Joseph J. Rowan was listed as a subscriber, and that the address at which service of the company was connected was 208 Baltimore Avenue, Takoma Park, Maryland. The witness thereupon verified an original record of the company, showing the installation of three telephones, as of the above address, sometime prior to August 19th, 1935; the numbers being Shepherd 3760, 3761, and 3762, and being changed to Shepherd 4600, 4601, 4602 on April 15th, 1937. He then

testified that the record of the transactions was made in the ordinary course of the company's business, and that it showed that the service was disconnected March 31st, 1938, upon the order of J. J. Rowan.

Theodore F. Vollten, the next witness offered by the State, testified that he was a detective sergeant of the Montgomery County police department; that, acting under instructions from the State's Attorney for said county, on December 2, 1937, he visited Takoma Park in quest of information in connection with alleged bookmaking conducted in or on the premises known as 208 Baltimore Avenue, Takoma Park, Montgomery County, Maryland; that he parked his automobile a square away from the above premises, in front of premises known as 113 Baltimore Avenue; that a connection to a terminal box on a telephone pole was made by a man whose name he did not know, but who was an employee of the telephone company designated as "Number 17"; that the witness then put earphones on his head, which connected with a service line of the company, and that the operator was asked "what number this was?" Although the witness did not then testify as to the reply the operator made to the above query, he was allowed to testify, subject to exception, as to conversations he then heard, relating to the placing of wagers on horse races, and to state that these conversations were heard over telephone number Shepherd 4600. Following this testimony the witness then stated that upon the basis of the information so procured, he obtained a search warrant and proceeded to search the premises known as 208 Baltimore Avenue. He was then shown an exhibit consisting of four papers attached together, and, upon being asked to identify the same, replied that it was the search warrant used in connection with his search of the above premises; whereupon the trial court sustained an objection to the admissibility of any evidence based upon such information as the witness may have obtained under the search warrant, but overruled the objection to the testimony of the witness with reference to intercepted calls overheard by

him through the method of wire tapping. On cross-examination the witness testified that the premises he searched were about one and a half squares from the District of Columbia line, and that he could hear the bell of Shepherd 4600 ring, whereupon the receiver would be lifted and an inside voice be heard to say "hello," and another voice would say "Doc."

Margaret E. Hickerson, another State witness, identified the original service contract between J. J. Rowan and the Chesapeake and Potomac Telephone Company, of which she was an employee, as having been signed by Rowan in her presence, and initialed by her; and she further identified Mr. Rowan as the subscriber to the contract.

The State next put in evidence land records tending to show that Eleanor E. Rowan acquired title to Lot 18 of Block 75 of Takoma Park Land and Trust Company subdivision, as shown in Plat Book No. 2 of the Land Records of Montgomery County, by deed dated November 8th, 1927, and recorded October 31st, 1927; and that said property was subsequently conveyed by Mrs. Rowan, widow, to E. Clara Turner by deed dated December 31st, 1937, recorded January 3rd, 1938. And it thereafter offered the testimony of John T. Williams, a clerk in the office of the County Commissioners of the county, tending to show by the records of said office that the lot in question was the same lot as that numbered 208 Baltimore Avenue, the witness testifying that the above records were kept for the purpose of tax assessments, and were prepared in the ordinary course of the business of the County Commissioners. The witness further detailed that the assessment books showed no property other than the property in question, located in the town of Takoma Park, assessed in the name of Mrs. Rowan. Other testimony tending to show the identity of the premises was offered by the State.

In addition thereto, the State supplemented the testimony of the witness Vollten, bearing upon the manner in which the information was secured by the process of

552

wire tapping, with the testimony of John Huiess, a stenographer. The latter witness stated that on December 2nd, 1937, in company with Vollten, and with the employee of the telephone company known as Number 17, he visited the scene of the wire tapping; that the employee of the company then tapped a telephone wire and asked "what number it was"; that at that time the witness was equipped with earphones and prepared to take down the conversations; that the reply to the above query was in a lady's voice and simply said "Shepherd 4600"; that the witness assumed the latter voice was that of the telephone operator. He was then asked: "Q. How did you know anybody came in on the line? A. I could only hear the answer of the lady. Q. Did she come in on the line and say 'Number, please'? A. No. When No. 17 asked what number was this, a lady's voice answered, 'Shepherd 4600.' Q. How did No. 17 know somebody was on the other end of the line? A. By instruments he had there. Q. (by the Court) When you testified before, according to the stenographer's notes, you said the voice said 'operator'? A. There was one place in the notes, and I so testified that the voice did say 'operator', but not in that conversation. Q. What part of the conversation did the voice say 'operator'? A. Where there was a break in the line from another number. Before the bell rang, inside said 'hello' and the telephone operator, which I assumed to be a telephone operator, said 'is the receiver on Shepherd 4602 off the hook', and the answer was by a man, who said, 'No, the receiver is not off the hook, operator'. Q. When did this lady's voice use the word operator? A. That was toward the afternoon. Q. In what connection was that? A. When the wire was broken down by Number 17, he did something with his instrument, and the telephone operator said, 'What number, please'? Q. The same voice? A. A lady's voice. Q. Was it the same as the other one? A. It sounded the same all afternoon."

The witness also testified that on December 1st, 1937, when Sergeant Vollten was not present, in company with

No. 17, and with the use of earphones, he heard a conversation over the telephone line under the following circumstances: No. 17 attached an instrument to a wire and asked what the number was; the witness heard a voice which he assumed was a telephone operator say "operator," and later he heard the supposed operator say "Shepherd 4600". He then proceeded to testify to a number of conversations which he had taken down as coming over the wire with which he was connected, detailing various transactions relating to placing bets on various horses and horse races; these conversations apparently relating to those heard by him on both occasions when he was present, namely, on December 1st, and December 2nd, 1937.

In support of the above testimony the witness Vollten was recalled, and then stated that the stenographer was present on the occasion of December 2nd, 1937. After detailing the manner in which the tapping of the main wire was effected, he gave this version of the transaction: "The two wires were attached to a telephone receiver and a transformer. I lifted the button on the receiver and there came a voice, 'number, please?' I answered, 'What is this number?' and then the voice, 'Shepherd 4600.'" At that time two other head sets or earphones were in use, one by No. 17 and the other by Mr. Huiess. On cross-examination, at this state of the testimony, the witness admitted that he had no knowledge, other than the voice he heard telling him that the number was Shepherd 4600, that the number over which he heard the conversation was, as a matter of fact, Shepherd 4600.

Upon the conclusion of the aforegoing testimony, all of which, bearing upon conversations alleged to have been heard by the method of wire tapping, and the identity of the appellants with the ownership of the property, was admitted subject to exception, the State rested its case; whereupon the appellants moved to strike from the record all of the testimony of the witnesses Huiess and Vollten relating to or reciting the telephone conversations alleged to have been heard over the telephone line of Shep-

herd 4600. The court, however, overruled the motion and permitted the testimony to remain in the case; and the defendants submitted the case without offering evidence on their own behalf.

During the course of the trial six exceptions were re-' served by the appellants as to the admissibility of evidence obtained through the process known as wire tapping; and three were reserved relating to the admissibility of evidence directed toward the identity of the premises and the ownership thereof, upon which the alleged bookmaking, betting, and gambling on horse races were conducted.

Briefly, the first group of exceptions above stated bring before this court for review the propriety of the trial court in admitting evidence bearing upon the following important matters: (a) The identity of the telephone number over which the alleged conversations were heard; and (b) the connection of the appellants, or either of them with said conversations, because of the peculiar circumstances under which the conversations were intercepted.

The exceptions embraced in the second group relate to the identity of the owner of the property with which the telephone line, over which the alleged conversations were heard, was connected.

Section 247 of article 27 of the Code of Public General Laws of this state makes it a misdemeanor for any person, association of persons or body corporate, within this State, in any manner to bet, gamble or wager, through the method commonly known as selling books or pools on the result of racing of any kind; and, secondly, to establish, keep, rent, use or occupy, or knowingly suffer to be used, kept or rented or occupied, any house, building or other place, within the State for the conduct of such unlawful business, or by any means or devices, for the purpose of receiving or becoming the depository or place of record or register, designed to forward money or other consideration of value to be wagered or gambled, in any manner, upon the result of any race, contest or

contingency. It is therefore clear, from an analysis of the above section, that the purpose of its provisions is not only to punish those who actually engage in the business prohibited by the statute, but also to punish those who knowingly permit property owned or controlled by them to be used for the purposes the law is designed to prohibit, although the latter may in no manner be interested in or otherwise connected with the conduct of the business.

The questions which the above exceptions raise are far-reaching in their effect, and since the use of telephones has become practically universal, in both the private and business affairs of life, the admissibility in evidence of intercepted telephone communications, in both civil and criminal cases, has been the source of extended controversy throughout this country. In the case of *Olmstead v. United States*, 277 U. S. 438, 48 S. Ct. 564, 72 L. Ed. 944, the Supreme Court held that evidence secured through the method of wire tapping, that is to say, by intercepting messages on the telephones of the accused by attaching wires to ordinary telephone wires connected with the residence or place of business from which the information was sought, was not in violation of either the 4th or 5th Amendments to the Federal Constitution; and upon this point many interesting cases were cited by the late Chief Justice Taft in support of that conclusion. It may be added, however, that since the decision in the *Olmstead* case was rendered, the Congress has enacted what is commonly known as the Federal Communications Act of June 19th, 1934, and that section 605 thereof (U. S. Code, Title, 47, sec. 605, 47 U. S. Code Ann. sec. 605) provides in part: "No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, * * * or in response to a subpoena issued by a court of competent juris-

diction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." An examination of the above section of the Communications Act reveals the fact that it is applicable to interstate or foreign communications only; and it may be observed that, since the passage of the Act, it has been so construed. In line with the latter construction, the ruling in the *Olmstead* case, in so far as Federal Courts are concerned, is no longer controlling. *Nardone v. United States,* 302 U. S. 379, 58 S. Ct. 275, 82 L. Ed. 314.

In *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, at page 571, 69 A. 405, at page 411, it was said: "In the first bill of exceptions the evidence of Mr. Wilbourn, superintendent of the Gardiner Company, in reference to a telephone conversation with the Knickerbocker Company, was admitted, subject to exception. He called up the company and inquired who was there, and the party at the phone said the Knickerbocker Ice Company. He did not recognize the voice of the person talking. The man at the phone stated the price of the ice and said they had plenty of it and would let the plaintiff have it provided it gave them all its trade. The plaintiff got five or six loads that day, * * * and all the orders were by telephone. He had talks with the same person and in each case he got all the ice he ordered. The ninth exception was to the refusal to strike out that evidence." After quoting with approval the case of *Murphy v. Jack,* 142 N. Y. 215, 36 N. E. 882, which laid down the principle that there is no objection to information obtained through the medium of a telephone, if it appears that the witness was acquainted with the voice of the person with whom he talked or that in some satisfactory way he knew it was the person with whom he had the conversation, the case of *Wolfe v. Mo. Pac. R. Co.,* 97 Mo. 473, 11 S. W. 49, was also cited with approval; in which latter case it was stated: "When a person places himself in connection with

the telephone system through an instrument in his office, he thereby invites communication in relation to his business through that channel. Conversations so held are admissible in evidence as personal interviews by a customer with an unknown clerk in charge of an ordinary shop would be in relation to the business therein carried on."

In support of the above statement of the law, this court, citing *Jones on Evidence*, sec. 210, and *Wigmore on Evidence*, sec. 2155, quotes from the latter authority as follows: "No one has ever contended that, if the person first calling up is the very one to be identified, his mere purporting to be A. is sufficient, any more than the mere purporting signature of A. to a letter would be sufficient. Ante, sec. 2148. The only case practically presented therefore is that of B.'s calling up A. and being answered by a person purporting to be A. There is much to be said for the circumstantial trustworthiness of mercantile custom (*ante*, sec. 95) by which, in average experience, the numbers in the telephone directory do correspond to the stated names and addresses, and the operators do call up the correct number, and the person called does in fact anwser. These circumstances suffice for some reliance in mercantile affairs; and it would seem safe enough to treat them in law as at least sufficient evidence to go to the jury." Following the above quotation, the court drew the deduction that; "As it is a character of evidence that might be used improperly, courts should be careful in the application of the rule." *Robinson v. Foundry Co.*, 152 Md. 81, 136 A. 58; *Miller v. Leib*, 109 Md. 414, 72 A. 466.

And it would seem that the above observation must apply with greater force in criminal than in civil cases, for the obvious reason that in the latter case it is only necessary to meet the burden of proof by a preponderance of evidence, whereas in the former the essential facts must be proved beyond a reasonable doubt. And while in the case of *Archer v. State*, 145 Md. 128, 125 A. 744, the reason for the ruling was not discussed, nevertheless, the court said that "the seventeenth (exception) was to permitting a witness to testify in reference to a conversa-

tion over the phone when he could not certainly identify the person with whom he had talked. This ruling was erroneous." In *Wharton's Criminal Evidence* (11th Ed.), sec. 379, the author states: "A conversation over the telephone is admissible, unless otherwise objectionable, if the identity of the person with whom the witness was speaking is satisfactorily established. If there is no identification, proof of the conversation must be excluded. It is hearsay and incompetent. Identification may be proved either by direct evidence or by facts and circumstances. Recognition of the voice may be sufficient. In some cases an inference of identity is raised, making *prima facie* proof, where a person is called from the telephone directory by the number corresponding to his name and address, and the party responds, informing the witness that he is the party called. Evidence is admissible where the persons intercepting a message recognize the voice of the party sought to be charged, and hear him state, upon being asked by the caller as to who is speaking, that he is such person."

It would seem from the quoted authorities that, in civil cases, evidence concerning the identity of a party answering a call to his recognized or official phone number, and responding to matters connected with the business in which he is engaged, is unquestionably admissible, although the identification of the voice of the respondent may be lacking, and, as a matter of fact, the response may be made by an agent of the proprietor of the business. But when evidence of answers to a call is offered for the purpose of criminal prosecution, it is imperative that there be established the identity of the respondent, although the conversations may have been heard over the admitted official telephone of the accused.

Applying the latter principle to the facts in the instant case, and bearing in mind that the conversations offered by the State were intercepted, as distinguished from the regular method of telephone communications, by an employee of the telephone company who was not called as a witness, but who nevertheless was shown to be uncertain

as to the telephone number on the wire he tapped, and secured that information, whether correctly or otherwise, from a female voice assumed to be that of a telephone operator, which latter voice is not identified by the testimony of any person, we cannot conclude that such testimony was admissible.

We are not unmindful that in the recent case of *Hitzelberger v. State,* 174 Md. 152, 197 A. 605, this court held that conversations overheard by intercepting wires leading into premises other than those of the accused, but in which conversations the accused participated, were admissible in evidence in this state, and that the means by which such evidence was secured was not in violation of either of the federal amendments to which reference above has been made, or of articles 22 and 26 of the Declaration of Rights of this State, or of section 4A of article 35 of the Code of this State (Code Supp. 1935). But in that case, it should be borne in mind, there was no controversy shown by the record as to either the identity of the number of the telephone wire which was intercepted, or of the individuals from which the alleged conversations offered in evidence purported to emanate.

The seriousness of admitting conversations under the peculiar facts shown by the record in this case is even more forcibly exemplified when applied to the appellant Eleanor E. Rowan than when applied to her co-defendant. This deduction is obvious, as it is not shown that she resided upon the premises, and the testimony throughout the record tends to show that the only female voice heard over the intercepted wire was a voice which the State maintains was that of an unknown telephone operator.

The first exception presents the theory that the evidence obtained as the result of wire-tapping is not admissible unless it is affirmatively shown that the intercepted message was an intrastate communication. That theory is based upon the assumption that the Federal Communications Act (U. S. Code, Title 47, sec. 605, 47 U. S. C. Ann., sec. 605) affects the admissibility of evidence thus obtained in state courts. It is perhaps true that in the ab-

560

sence of such a showing such evidence would be inadmissible in a federal court. *Nardone v. United States, supra; United States v. Reed* (C. C. A.), 96 Fed. 2nd, 785. But it is not understood that the Federal Communications Act was intended to or does limit the power of state courts to determine in cases tried therein the admissibility of evidence so obtained. The case of *Olmstead v. United States, supra,* quoting from the opinion of *United States v. Reid,* 12 How. 361, 13 L. Ed. 1023, supports that view. So that, while for the reasons stated above the evidence was inadmissible, it was not inadmissible because the message may have been an interstate communication, although that fact may have given the witness a privilege not to answer it on the ground that his answer might incriminate him.

From what we have said, the judgment must be reversed, and a new trial awarded.

*Judgment reversed, and new trial awarded, with costs to the appellants.*