## Commonwealth v. Charpentier

Before Soffel, Graff and Smart, J. J.

*William S. Rahauser*, district attorney, and *Samuel Strauss*, assistant district attorney, for Commonwealth.

*Louis C. Glasso*, for defendant.

SOFFEL, J., March 5, 1951.—Defendant, Horace Charpentier, alias Horace Carpentier, was indicted, together with Ben Edelman, at the above term and number, charged with burglary. Ben Edelman plead guilty. Defendant was tried, and the jury returned a verdict of guilty. The case is now before the court on a motion ex parte defendant for a new trial, predicated upon the alleged error of the trial judge in admitting into evidence certain interstate telephone communications heard by detectives who had tapped defendant's telephone lines in New York City.

On November 5, 1949, the home of Samuel Bluestone, at 2707 Beechwood Boulevard, Pittsburgh, Pa., was entered and burglarized between the hours of 8:30 p.m. and 11 p.m. Mr. Bluestone, his wife, and child left home that evening about 8:30 to go to the movies and returned about 11 p.m., to find lights in the house and the front door open. A safe which had been built into the wall of a hall cupboard had been forced open and about $4,300 in cash and certain other valuables taken therefrom. A jewelry case containing rings, watches, pins, and necklaces belonging to Mrs. Bluestone had been taken from a dresser drawer. Detec-

tives Weldin and Mulligan, assigned to the burglary squad of New York City, arrested defendant and Edelman in defendant's Cadillac car on the New York side of the Holland Tunnel, on the evening of November 8, 1949. Upon search, the detectives found on the person of Edelman certain moneys, and, in a suitcase belonging to him, items of costume jewelry admittedly burglarized from the home of Sam Bluestone in Pittsburgh three days prior. In the trunk of defendant's car and in a bag belonging to defendant, certain items of valuable jewelry were found, all of which were positively identified as the property of Bluestone. $1,400 was taken from his person, in denominations similar to that taken from the victim's home in the burglary. In addition to the above evidence, a ring was taken from the purse of Lillian Dwornick, a friend of defendant riding beside him, who testified that the ring was given to her by defendant an hour after the burglary and while she was in Pittsburgh. This ring was also admittedly stolen from the home of Sam Bluestone during the burglary.

In addition to the above, the Commonwealth offered in evidence three addressed, stamped letters, which testimony showed were given to a witness, Markwell—at the time an inmate of the county jail—by defendant for surreptitious mailing from the jail. These letters contained a diagram or lay-out of the victim's home and were purportedly written by the burglar who did the job, although the letters were signed with a forged name.

Over the objection of counsel for defendant, the Commonwealth was permitted to introduce into evidence testimony of tapped telephone conversations between defendant and his wife that could be construed as of an incriminating nature. The tapping of the telephone lines took place in New York City by Detectives Weldin and Mulligan, pursuant to a court order properly ob-

tained in the court of New York, under authority of New York law. Five of the conversations were interstate, emanating from defendant in Pittsburgh and directed to his wife Yvonne in New York City; two were intrastate (within New York City).

The sole question before the court is this:

"In a trial in the criminal courts of the State of Pennsylvania, where defendant is charged with having committed burglary in the City of Pittsburgh, Pa., is it reversible error to admit into evidence testimony obtained by tapping interstate telephone communications—the tapping of the lines having occurred in New York City, pursuant to a court order issued under the authority of a New York statute?"

Or, stated in another way:

"Does the Federal Communications Act of 1934 prohibit the introduction into evidence in a State court in the prosecution for a State crime of testimony obtained by tapping interstate telephone communications?"

## Construction of Section 605 of the Federal Communications Act of 1934

The Federal Communications Act of June 19, 1934, c. 652, 1 et seq., 48 Stat. at L. 1064 et seq., 47 U.S.C. §151 et seq., is an act designed to the end that the Federal Communications Commission have jurisdiction over and power to regulate within the terms of the act all interstate and foreign communication and transmission of energy by wire or radio. 47 U.S.C. §605, provides as follows:

"[Clause 1] No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to

forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpoena issued by a court of competent jurisdiction, or on demand of other lawful authority; [clause 2] and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; [clause 3] and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; [clause 4] and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto. . . ."

The first clause of this section prohibits employes of communication agencies from divulging any interstate or foreign communication except upon lawful authority. The third clause likewise refers to employes of communication agencies and provides that no person not entitled thereto shall receive or divulge interstate or foreign communications or use them for his own benefit or for the benefit of others not entitled thereto. The second clause provides that no person not authorized by the sender shall intercept any communication and divulge or publish the contents thereof to any person. It will be noted that the qualifying phrase "interstate

or foreign" is omitted before the word "communication" and that this clause on its face prohibits the intercepting or divulging of any communication whatsoever. The fourth clause of the section provides that no person who has received and intercepted a communication shall publish it or use it for his own benefit or for the benefit of others not entitled to receive it. This clause also omits the qualifying phrase "interstate or foreign" and refers simply to "such intercepted communication"—obviously the communication designated in the second clause of the section.

It follows therefore that if the section be accepted at its face value it does in fact prohibit employes of communication agencies from divulging, except upon lawful authority, making use of or permitting others to make use of any interstate or foreign communication. This is the gist of the first and third clauses. The section also prohibits any person from intercepting, divulging or making use of any communication. Such is the gist of the second and fourth clauses: Sablowsky v. United States, 101 F. (2d) 183, 186.

We are concerned in the instant case with the second and fourth clauses. In the Sablowsky case, cited supra, and in Nardone et al. v. U. S., 302 U. S. 379, the court holds that section 605 creates a rule of evidence relating to the admission of intercepted wire communications sought to be divulged by officers of the United States in courts of the United States. The rule of the exclusion of such evidence sought to be given by Federal officers in the courts of the United States was held to be applicable to intercepted intrastate communications as well as interstate communications.

"The ethical problem with which Congress was engaged and which it apparently sought to solve by enacting Section 605 is identical whether the communications intercepted and offered in evidence be interstate or intra-state": Sablowsky v. United States, supra.

The Nardone case, supra, holds that in view of the provisions of section 605 of the Communications Act of 1934, evidence obtained by Federal agents by tapping telephone wires and intercepting messages is not admissible in a criminal trial in the Federal district court. The language "no person" in the second clause is construed to include Federal agents engaged in the detection of crime. At page 382, Mr. Justice Roberts, speaking for the court, says:

"We nevertheless face the fact that the plain words of §605 forbid anyone, unless authorized by the sender, to intercept a telephone message, and direct in equally clear language that 'no person' shall divulge or publish the message or its substance to 'any person.' To recite the contents of the message in testimony before a court is to divulge the message. The conclusion that the act forbids such testimony seems to us unshaken by the government's arguments."

In the instant case it is conceded that the admission into evidence in the courts of this Commonwealth of testimony obtained as a result of tapping of interstate telephone communications does not contravene its constitution, any State legislative enactment, or any opinion setting forth judicial construction.

"As pointed out in People v. Defore, 242 N. Y. 13, the courts of last resort in fourteen states, and the Supreme Court of the United States, hold that articles obtained by means of an illegal search warrant, cannot be used in evidence against the party from whose possession they were thereby taken, while thirty-two courts of last resort hold that they can be. To this latter number should be added the English courts, the Superior Court of this State, and most of the text writers. A large, but not complete list of the authorities holding the evidence admissible, will be found in Com. v. Street, 3 Pa. Dist. & County Reports 783, 795": Commonwealth v. Dabbierio, 290 Pa. 174, 177.

To render such evidence inadmissible in a State court it would have to be excluded either by virtue of the United States Constitution or by an act of Congress properly within the scope of Federal power.

We are of the opinion that the admission into evidence of wire tapping in the instant case is not a violation of the fourth or fifth amendments of the Federal Constitution, nor a violation of the "due process" clause of the fourteenth amendment.

Since the only wire tapping cases before the United States Supreme Court involving State court action were instances where certiorari was denied, we must review the decisions of the Federal court cases to interpret their reasoning.

The Weeks Doctrine, enunciated in 1914 in Weeks v. U. S., 232 U. S. 383, held that in a Federal prosecution the fourth amendment barred the use of evidence secured through an illegal search and seizure. In Wolf v. Colorado, 338 U. S. 25 (1949), the court reaffirmed the Weeks doctrine as applied to Federal courts, but held that in a prosecution in a State court for a State crime the fourth amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure.

Even after Weeks v. U. S., supra, the Supreme Court has consistently refused to treat Federal cases of wire tapping as an unreasonable search and seizure or as a violation of the fourth or fifth amendments.

In Olmstead v. U. S., 277 U. S. 438, 462, 465-66, the Supreme Court, construing wire tapping evidence in Federal courts, held that the protection guaranteed to American citizens by the fourth amendment to the Federal Constitution against unreasonable search and seizure of their person, houses, papers and effects, does not extend to telegraph and telephone messages and therefore the use of evidence of private conversations intercepted by means of wire tapping does not infringe

any constitutional right. The court stated its position in the following language:

"There is no room in the present case for applying the Fifth Amendment unless the Fourth Amendment was first violated. There was no evidence of compulsion to induce the defendants to talk over their many telephones. They were continually and voluntarily transacting business without knowledge of the interception.

"Congress may of course protect the secrecy of telephone messages by making them, when intercepted, inadmissible in evidence in Federal criminal trials, by direct legislation, and thus depart from the common law of evidence. But the courts may not adopt such policy by attributing an enlarged and unusual meaning to the Fourth Amendment."

The Olmstead case is still considered the basic law of the Supreme Court on the subject of wire tapping, the only change being that Congress has exercised its prerogative referred to in the Olmstead case by enacting in 1934 the Federal Communications Act, prohibiting such evidence in Federal courts.

In the case of Nardone et al. v. U. S., 308 U. S. 338, the Supreme Court held in construing section 605 of the Communications Act of 1934, c. 652, 48 Stat. at L. 1064, 1103; 47 U. S. C. §605, that evidence procured by means of intercepting any wire or wireless communication is not admissible in a Federal court for any purpose at all, because the evidence thus procured is in violation of section 605 of the Communications Act of 1934. (It is to be noted that this rule of evidence is restricted to Federal courts.)

The latest Federal court decision wherein the basic law of the Olmstead case was reaffirmed is U. S. v. Coplon, D. C. N. Y., 88 F. Supp. 921, 927, where the court held:

"The law applicable to the admissibility of evidence secured by means of the interception of telephone communications has been established. Wire tapping is not a search and seizure in contravention of the Fourth Amendment to the Constitution. Olmstead v. U. S., 277 U. S. 438, and evidence secured by this means is inadmissible in the Federal Courts solely by reason of Sec. 605 of the Federal Communications Act."

The wire tapping in the instant case was done in conformity with article I, sec. 12, of the New York Constitution. This authorizes telephone and telegraph interception by certain law enforcement officers upon the issuance of warrants or ex parte court orders. Section 813 of the New York Code of Criminal Procedure defines the steps which officers are required to follow and which were followed in the instant case, namely:

1. Applications made only upon request of district attorney, attorney general or police officer above rank of sergeant.

2. Must be on oath or affirmation that there is reasonable ground to believe that evidence of a crime may be thus obtained.

3. May be made only to judge of court of general sessions, county court, or New York Supreme Court.

If the evidence gained through wire tapping is to be excluded in the present case, it must be upon some basis other than a Federal constitutional prohibition.

The Commonwealth contends that the Federal Communications Act of 1934 does not prohibit the introduction of wire tapped evidence in a State court, even though an interstate interception is involved.

It is elementary law that the United States Congress may prescribe rules of evidence for Federal courts just as the State legislature may promulgate rules of evidence affecting this court. Laws of Congress effectuating a granted power such as the power to regulate interstate commerce must be germane to the power granted.

It is not to be assumed that Congress intended to circumscribe the police powers of the State unless it unequivocally indicated such an intent. The State cases decided since the Federal Act of 1934 in which certiorari was denied indicate the contrary.

In Leon et al. v. State, 180 Md. 279, 23 A. (2d) 706, certiorari denied, 316 U. S. 680, the Supreme Court of Maryland held as follows:

"However, in view of the decision in the Olmstead case we hold that evidence procured by wire tapping is not prohibited in the State courts, either by the Federal Constitution or by the Federal Communications Act. It is true that it is a criminal offense in Maryland, as in most other states, for any person connected with a telegraph or telephone company to divulge the contents or nature of any message. . . . But evidence obtained by means of wire tapping is not made inadmissible."

The Maryland courts prior to this last cited case held in Rowan et al. v. State, 175 Md. 547, 3 A. (2d) 753, as follows:

"But it is not understood that the Federal Communications Act was intended to or does limit the power of state courts to determine in cases tried therein the admissibility of evidence so obtained. The case of Olmstead v. U. S. . . . supports that view."

The New York courts have construed the Federal Communications Act in a similar manner. In People v. Stemmer, 298 N. Y. 728, affirmed, 336 U. S. 963, the court refused to hold that section 605 of the Federal Communications Acts bars the admission of wire tapped evidence in State courts. And New York courts again in Harlem Check Cashing Corporation v. Bell, 296 N. Y. 15, distinguished the case of Weiss v. U. S., 308 U. S. 321, and held as follows:

"While there are expressions in the opinion of the court which seem to go so far as to interpret the Federal statute as a substantive law forbidding all disclosure or

divulgence, the decision was concerned only with the propriety of the receipt of such intercepted messages in evidence on the trial of a criminal case in a Federal court. The State of New York having provided, by constitution and statute, certain specific methods by which it may exercise its fundamental power of gathering evidence of criminality and of prosecuting crime, it surely is not to be assumed that Congress intended to circumscribe that power unless it unequivocally indicated such an intent. A Federal statute, it is recognized, must be presumed to be limited in effect to the Federal jurisdiction and not to supersede a State's exercise of its police power unless there be a clear manifestation to the contrary. (Townsend v. Yeomans, 301 U. S. 441, 454; Atchison Ry. v. Railroad Comm., 283 U. S. 380, 392-393; Savage v. Jones, 225 U. S. 501, 533.)"

A close analogy to the question here involved is found in the decision of the State courts concerning the effect of the Federal Stamp Law which provides for the exclusion from evidence "in any court" of documents not stamped as prescribed by statute. The majority of State courts held that the words "in any court" were not intended to regulate State tribunals inasmuch as Congress was not empowered to enact a law of such scope.

Professor Wigmore is in the forefront of those advocating wire tapping on condition that it is properly supervised: Wigmore on Evidence, par. 2183, 3rd ed., 1940.

We are of the opinion that the second and fourth clauses of the Federal Communications Act were never intended to be used as a rule of evidence in a State court, and it has not been so construed by State courts since the passage of the Act of 1934.

*Due Process of Law Under the Fourteenth Amendment*

In Wolf v. Colorado, supra, Mr. Justice Frankfurter discusses at some length "due process of law" as

guaranteed by the fourteenth amendment. In this case the court held that in a prosecution in a State court for a State crime, the fourteenth amendment of the Federal Constitution does not forbid the admission of relevant evidence, even though obtained by an unreasonable search and seizure. Mr. Justice Frankfurter states that the precise question for consideration is this:

"Does a conviction by a State court for a State offense deny the 'due process of law' required by the Fourteenth Amendment, solely because evidence that was admitted at the trial was obtained under circumstances which would have rendered it inadmissible in a prosecution for violation of a federal law in a court of the United States because there deemed to be an infraction of the Fourth Amendment as applied in Weeks v. United States, 232 U. S. 383?"

We cite from his opinion the following sections which we consider pertinent to the question raised in the instant case:

"Unlike the specific requirements and restrictions placed by the Bill of Rights (Amendments I to VIII) upon the administration of criminal justice by federal authority, the Fourteenth Amendment did not subject criminal justice in the States to specific limitations. The notion that the 'due process of law' guaranteed by the Fourteenth Amendment is shorthand for the first eight amendments of the Constitution and thereby incorporates them has been rejected by this Court again and again, after impressive consideration. See, e.g., Hurtado v. California, 110 U. S. 516; Twining v. New Jersey, 211 U. S. 78; Brown v. Mississippi, 297 U. S. 278; Palko v. Connecticut, 302 U. S. 319. Only the other day the Court reaffirmed this rejection after thorough reexamination of the scope and function of the Due Process Clause of the Fourteenth Amendment. Adamson v. California, 332 U. S. 46. The issue is closed.

"For purposes of ascertaining the restrictions which the Due Process Clause imposed upon the States in the enforcement of their criminal law, we adhere to the views expressed in Palko v. Connecticut, *supra*, 302 U. S. 319. That decision speaks to us with the great weight of the authority, particularly in matters of civil liberty, of a court that included Mr. Chief Justice Hughes, Mr. Justice Brandeis, Mr. Justice Stone, and Mr. Justice Cardozo, to name only the dead. In rejecting the suggestion that the Due Process Clause incorporated the original Bill of Rights, Mr. Justice Cardozo reaffirmed on behalf of that Court a different but deeper and more pervasive conception of the Due Process Clause. This Clause exacts from the States for the lowliest and the most outcast all that is 'implicit in the concept of ordered liberty.' 302 U. S. at 325.

"Due process of law thus conveys neither formal nor fixed nor narrow requirements. It is the compendious expression for all those rights which the courts must enforce because they are basic to our free society. . . .

"The real clue to the problem confronting the judiciary in the application of the Due Process Clause is not to ask where the line is once and for all to be drawn but to recognize that it is for the Court to draw it by the gradual and empiric process of 'inclusion and exclusion.' Davidson v. New Orleans, 96 U. S. 97, 104 (pp. 26, 27).

". . . Granting that in practice the exclusion of evidence may be an effective way of deterring unreasonable searches, it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective. Weighty testimony against such an insistence on our own view is furnished by the opinion of Mr. Justice (then Judge) Cardozo in People v. Defore, 242 N. Y. 13, 150 N. E. 585. We cannot brush aside the experi-

ence of States which deem the incidence of such conduct by the police too slight to call for a deterrent remedy not by way of disciplinary measures but by overriding the relevant rules of evidence. There are, moreover, reasons for excluding evidence unreasonably obtained by the federal police which are less compelling in the case of police under State or local authority. The public opinion of a community can far more effectively be exerted against oppressive conduct on the part of police directly responsible to the community itself than can local opinion, sporadically aroused, be brought to bear upon remote authority pervasively exerted throughout the country.

"We hold, therefore, that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure (pp. 31, 32, 33)."

Thus we likewise hold in the instant case that the "due process of law" guaranteed by the fourteenth amendment was not violated by introducing into evidence the testimony obtained by intercepting interstate telephone communications.

### *"Harmless Error" Doctrine*

Even if it should be construed that the admission of the evidence under the circumstances of the instant case was error, it must be considered "harmless error".

"The doctrine of harmless error is a valuable adjunct to our modern law; its purpose is to cast upon the party complaining of technical or procedural errors the burden of showing that they have substantially affected his legal rights.

"The doctrine of harmless error is not a mere mechanical formula to be applied automatically, indiscriminately, and against the defendant, whenever a record contains the necessary minimum evidence legally sufficient to support a conviction.

"The determination of the question whether as the result of error prejudice has indelibly and hurtfully permeated the trial depends in the final analysis upon the facts of the individual case.

"In determining whether or not an error was harmless, the inquiry is not merely whether there was enough to support the result, apart from the phase affected by the error, but, rather, even so, whether the error itself had substantial influence; if so, or if there is not fair assurance that the error did not have substantial influence, the conviction cannot stand": Commonwealth v. Blose, 160 Pa. Superior Ct. 165 (syllabus).

"The best approach to a rule we have found is the recent pronouncement by Mr. Justice Rutledge in Kotteakos v. United States, 328 U. S. 750, 66 S. Ct. 1239, 1248. After analyzing the Act of Congress (28 U. S. C. A. §391), relating to harmless errors, he said: 'If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand' ": Commonwealth v. Blose, supra.

In U. S. v. Reed et al., CCA, N. Y. 1938, 96 F. (2d) 785, certiorari denied 305 U. S. 612, appellants were

tried and convicted in the State of New York for violation of the White Slavery Law and conspiracy. An appeal was taken˙ on grounds of alleged error in the court's admission of evidence gained by unlawful interception of communications by telephone, one conversation taking place between appellant in New York and one Sally Kelley in Florida. The court held this to be error under the doctrine of Nardone v. U. S., 302 U. S. 379, but went on to say:

"But, while it was error to permit this witness to testify to the conversation he had unlawfully intercepted, the error was harmless, since both (the witness) and (the defendant) testified concerning that conversation and to the same effect as did the witness who had tapped the wire."

The court said further, citing U. S. v. Bonanzi et al., 94 F. (2d) 570:

". . . But there was ample evidence without any of that gained by wire tapping to prove beyond a reasonable doubt that appellants were doing what the intercepted communications indicated and that these girls were some of their prostitutes. No impartial jury could have found otherwise on the evidence had the erroneously admitted evidence not been introduced at all. And so no reversible error on this account was made to appear."

The case above is exactly in point with the instant case. Both defendant and his wife, between whom the telephone conversations were made, admitted on the witness stand the substance of the conversations—even amplifying them. In addition to this fact, the evidence in the case, independent of that obtained through wire tapping, was complete and sufficient in itself to sustain a conviction for the crime of burglary.

The motion ex parte defendant for a new trial will therefore be refused.